854 A.2d 378

AUTO LENDERS ACCEPTANCE CORPORATION, PLAINTIFF, v. GENTILINI FORD, INC., DEFENDANT AND THIRD PARTY PLAINTIFF–APPELLANT, v. PNC BANK NATIONAL ASSOCIATION, JOHN DOES 1–10, RANDY CARPENTER, RICHARD BAKER, SHAWN HAMILTON, SHANDA BODDIE, SEAN MURRAY, THOMAS EIDELL, CHRISTOPHER JACKSON, TAMIKA FORTUNE, STARR BARNUM, CASSANDRA BROCK, LATOYA SAVAGE, KENYATTA SAUNDERS, KENNETH GRAHAM, CORNEILIA THROWER, JOYCE TAYLOR, ALFIE STEPHENS, DELORES SIMPSON, TAIRAT AJOKE DISU, RAYMOND BICKEL, EDWARD ISIAH GRAHAM, TROY BUTLER, JULIUS JERMELLE, EUGENE COBBS, MICHAEL WHITE, JR., BENJAMIN MANSFIELD, WAYNE TUCKER, CHARLES LENTZ, JOANN JACOBS, MICHELE SLOAN AND TIFFANY RICHARDSON AND CHRISTI INSURANCE GROUP, INC., THIRD PARTY DEFENDANTS, AND THE OHIO CASUALTY GROUP OF INSURANCE COMPANIES, AMERICAN WEST FIRE AND CASUALTY COMPANY AND WEST AMERICAN INSURANCE COMPANY, THIRD PARTY DEFENDANTS–RESPONDENTS.

Argued January 5, 2004—Decided August 16, 2004.

248

*Eric C. Garrabrant* argued the cause for appellant (*Serber, Konschak & Jaquett,* attorneys).

*Andrew S. Kent* argued the cause for respondents (*Wolff & Samson,* attorneys; *Armen Shahinian* and *Scott D. Baron,* of counsel).

Justice ZAZZALI delivered the opinion of the Court.

Randy Carpenter, an employee of Gentilini Ford, Inc., engaged in numerous credit-application frauds over the course of an eleven-month period, leading to the sale of twenty-seven automobiles to customers who otherwise would not have qualified for credit. In this appeal, we must determine whether losses sustained as a result of Carpenter's conduct are covered under an employee-dishonesty provision of Gentilini Ford's insurance policy. We must also decide whether Carpenter's conduct constitutes a single occurrence under the policy for the purpose of determining the insurance company's potential liability.

I.

The following facts are not in dispute. Appellant Gentilini Ford, Inc. (Gentilini) is an automobile dealership located in Woodbine, New Jersey. To facilitate the sale of automobiles to its customers, Gentilini entered into a retail-paper "Dealer Agreement" with PNC Bank, N.A. (PNC Bank). Under the terms of the agreement, PNC Bank provided financing for installment sales contracts that Gentilini executed with its customers. By a separate agreement between PNC Bank and Auto Lenders Acceptance Corporation (Auto Lenders), Auto Lenders had the option to finance any contract rejected by PNC Bank.

Gentilini's standard sales arrangement worked as follows. Customers seeking financing for automobile purchases submitted credit applications to Gentilini, which then forwarded the applications to PNC Bank or Auto Lenders for approval. PNC Bank had the first option to approve financing and tended to accept lower-risk applicants, leaving for Auto Lenders the higher-risk, though still creditworthy, applicants whom PNC Bank had refused. For each approved application, Gentilini would enter into an installment sales contract with the purchaser, taking a cash deposit after accepting the customer's note. Under the terms of Gentilini's Dealer Agreement with PNC Bank and Auto Lenders, the accepting lender advanced cash in the face amount of the customer's

note to Gentilini. The lending institution would then take an assignment of Gentilini's rights under the customer's installment contract, including a security interest in the financed vehicle, any service contracts for the vehicle, and the right to any insurance proceeds subsequently paid for damage to the vehicle.

In early 1998, Auto Lenders investigated numerous credit applications that it had accepted through its arrangement with Gentilini. It discovered that Randy Carpenter, a Gentilini employee involved in automobile financing, had engaged in a number of credit-application frauds between February and December 1997 to secure loans for customers who otherwise were not creditworthy. Specifically, Auto Lenders learned that several customers without driver's licenses had fictitious licenses submitted on their behalf. Other customers, whose salaries were inadequate to qualify for credit, had falsified pay stubs submitted by facsimile to Auto Lenders. Indeed, a subsequent investigation revealed that many of the fraudulent submissions appeared to be alterations of Carpenter's own pay stubs. Auto Lenders concluded that, in total, twenty-seven of the credit applications it had approved contained falsified information.

In July 1998, after several of the loans under investigation went into default, Auto Lenders filed suit against Gentilini for fraud and breach of contract. In its complaint, Auto Lenders sought to enforce a portion of the Dealer Agreement that gave it an absolute right of recourse against Gentilini if any of the information conveyed by Gentilini during the finance-approval process proved to be untrue. Pursuant to the agreement, Auto Lenders sought to exercise its right to have Gentilini repurchase all outstanding installment contracts that had not been paid in full, regardless of whether any individual contract contained fraudulent information. It, therefore, demanded judgment in the amount of $831,932.90.

Gentilini filed its answer and a third-party complaint in October 1998, denying liability to Auto Lenders and asserting claims against PNC Bank, Randy Carpenter, and the customers identified by Auto Lenders who allegedly submitted fraudulent credit

applications. Later, in June 1999, Gentilini amended its answer and third-party complaint, naming the Ohio Casualty Group of Insurance Companies, American West Fire & Casualty Company, and West American Insurance Company (collectively Ohio Casualty) as additional third-party defendants. Gentilini alleged that Ohio Casualty had an obligation to defend Gentilini and indemnify it for its losses under an existing insurance policy, but Ohio Casualty denied any such duty.

Auto Lenders and Gentilini entered a stipulation in December 2000 whereby Gentilini agreed to pay Auto Lenders $215,000 in full settlement of Auto Lenders' claims against Gentilini. With the exception of Gentilini's claims against Ohio Casualty, all claims against all remaining parties were voluntarily dismissed.

Gentilini based its claims against Ohio Casualty on a "Commercial Package" insurance policy. The "Building and Personal Property Coverage Form" of the policy defined Ohio Casualty's basic commitments with respect to "Covered Property," which included "Business Personal Property" such as "Stock" (defined as "merchandise held in storage or for sale"), but specifically excluded "[a]utomobiles held for sale" and all "[a]ccounts, bills, currency, deeds, food stamps or other evidences of debt, money, notes or securities." However, an endorsement attached to the policy, designated as the "Master Pak for Property," modified the terms of the property coverage form. Relevant to the present appeal is the endorsement's "Employee Dishonesty" provision, which provides in pertinent part:

(1) You may extend the insurance provided by this Coverage Form to apply to direct loss of or damage to Business Personal Property and "money" and "securities" resulting from dishonest acts committed by any of your employees acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

   (a) Cause you to sustain loss or damage; and also

   (b) Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

   (i) Any employee; or

   (ii) Any other person or organization.

. . . .

(3) The most we will pay under this Extension for loss or damage in any one occurrence is $5,000.

(4) All loss or damage:

  (1) Caused by one or more persons; or

  (2) Involving a single act or series of related acts; is considered one occurrence.

Ohio Casualty moved for summary judgment in reliance on the parties' pleadings and the plain language of the insurance policy. Gentilini filed a cross-motion for summary judgment.

The Law Division granted summary judgment in favor of Gentilini on the issue of coverage under the employee-dishonesty provision of the policy.[1] In its decision, the court concluded that Carpenter's conduct constituted "dishonest acts" as defined by the policy and that his actions resulted in a "direct loss" to Gentilini. In addition, the court rejected Ohio Casualty's argument that Carpenter's conduct was one "occurrence" under the policy. It concluded that Carpenter defrauded Auto Lenders on twenty-seven different occasions, not that he engaged in twenty-seven fraudulent acts culminating in a single, overarching fraud. Accordingly, the court determined that Ohio Casualty's policy provided coverage to Gentilini Ford for $135,000, or $5,000 for twenty-seven separate occurrences.

Gentilini subsequently moved for an entry of final judgment and prejudgment interest, and applied to recover its attorneys' fees both for defending against Auto Lenders' action and for enforcing its rights against Ohio Casualty under the insurance policy. The trial court granted the motion and awarded interest and fees as requested by Gentilini. A final judgment of $191,206.83, encompassing damages, attorneys' fees, expenses, and prejudgment interest was entered in November 2001. Ohio Casualty appealed.

On appeal, a divided panel of the Appellate Division reversed summary judgment in favor of Gentilini and remanded the matter

---

[1] The court granted summary judgment in favor of Ohio Casualty with regard to Gentilini's coverage under a separate umbrella policy. Neither party appealed from that portion of the trial court's decision.

to the Law Division for entry of judgment in favor of Ohio Casualty. *Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.,* 358 *N.J.Super.* 28, 38, 816 *A.*2d 1068 (2003). Turning first to Carpenter's fraudulent conduct, the majority determined that Carpenter's actions were not covered by the policy's terms because his "manifest intent" was not "to cause loss or damage" to Gentilini, but to defraud Auto Lenders. *Id.* at 34, 816 *A.*2d 1068. If anything, the majority reasoned, Gentilini was an "unintended beneficiary of the fraud" because it "received and kept the down payment[s] paid by the buyers, received full credit for the amount of the loan amortized by the debtors[,] and retained its right to institute legal action directly against the buyers, both to repossess the collateral and seek payment of the outstanding loan balance." *Id.* at 34–35, 816 *A.*2d 1068 (footnote omitted). In addition, with regard to the question of whether Gentilini had suffered a "direct loss" as required by the policy, the majority held that no such loss had occurred because "the facts involve fraudulent conduct by the employee directed against a third-party." *Id.* at 36, 816 *A.*2d 1068. Applying the "plain and ordinary meaning" of direct loss, the majority concluded coverage was appropriate only if "the employee's action [is] directed against the employer...." *Ibid.* Having determined that Gentilini's claim was not covered by the policy, the majority also vacated the trial court's award of attorneys' fees. *Id.* at 38, 816 *A.*2d 1068.

In dissent, Judge Wecker argued that Ohio Casualty's insurance policy covered Gentilini's losses and that summary judgment had been properly granted. *Id.* at 38, 48, 816 *A.*2d 1068. She reasoned that "under the circumstances, Carpenter's conduct involved the 'manifest intent' to harm, not to help Gentilini," and that Gentilini's obligation under the terms of its contract with Auto Lenders to repurchase the outstanding installment contracts as a result of Carpenter's conduct was a "direct loss" within the meaning of the policy. *Id.* at 40–41, 816 *A.*2d 1068. In addition, the dissenter concluded that the twenty-seven fraudulent transactions induced by Carpenter over an eleven-month period were separate occurrences each subject to a separate $5,000 limit. *Id.*

at 47, 816 A.2d 1068. She agreed with the majority, however, that Gentilini was not entitled to attorneys' fees. *Id.* at 48, 816 A.2d 1068.

Gentilini filed an appeal as of right based on Judge Wecker's dissent. *R.* 2:2(1)(a).

## II.

Gentilini seeks coverage for its losses under the employee-dishonesty provision of the Master Pak endorsement it purchased from Ohio Casualty. When broken down into its basic components, that provision requires Gentilini to prove the following elements in order for its losses to be covered: (1) it must have suffered a "direct loss of or damage to Business Personal Property[,] 'money[,]' [or] 'securities' "; (2) that loss must have resulted from "dishonest acts" committed by Carpenter; (3) Carpenter must have committed those dishonest acts with the "manifest intent" to cause Gentilini to suffer a loss; and (4) Carpenter must have committed those dishonest acts with the "manifest intent" to obtain a financial benefit, other than those listed in the policy's exclusionary clause, for himself or a third party. *See Resolution Trust Corp. v. Fid. & Deposit Co. of Md.,* 205 *F.*3d 615, 636 (3d Cir.2000) (defining similar elements under comparable insurance policy).

In the present appeal, there is no genuine dispute that Carpenter engaged in dishonest acts, such as fabricating pay stubs and drivers' licenses, that ultimately led Gentilini to sell twenty-seven vehicles to non-creditworthy customers. The parties, however, dispute whether Gentilini suffered a direct loss as the result of Carpenter's actions and whether Carpenter acted with the manifest intent to harm Gentilini and benefit himself or others as defined by the policy.

As detailed below, our review of the above issues leads us to conclude that summary judgment should not have been granted for either party. The actual losses sustained by Gentilini as a

result of Carpenter's conduct require further proof, and several additional issues of material fact remain for jury determination.

### III.

#### A.

We first must address whether Gentilini suffered a "direct loss of or damage to Business Personal Property[,] 'money[,]' [or] 'securities' resulting from" Carpenter's dishonest acts. Gentilini equates "direct loss ... resulting from" with "harm proximately caused by," and thus asserts that its $215,000 settlement payment to Auto Lenders constitutes a direct loss of money directly traceable to Carpenter's conduct. In addition, Gentilini embraces the reasoning of Judge Wecker's dissent, arguing that it forfeited valuable contractual rights when Carpenter "caused [Gentilini] to convey valuable property—motor vehicles—without receiving its anticipated consideration." *Gentilini, supra,* 358 *N.J.Super.* at 45, 816 *A.*2d 1068. Conversely, Ohio Casualty champions the result reached by the majority below, contending that any losses Gentilini might have suffered as the result of Carpenter's dishonesty were not direct and did not fall within the types of property specified in the insurance agreement.

Several courts examining related questions have employed a proximate-cause test to determine whether a particular loss was covered under the terms of an insurance agreement. For instance, in *Search EDP, Inc. v. American Home Assurance Co.,* 267 *N.J.Super.* 537, 543–44, 632 *A.*2d 286 (App.Div.1993), *certif. denied,* 135 *N.J.* 466, 640 *A.*2d 848 (1994), the court applied a proximate-cause test to determine coverage for losses under an errors and omissions policy where the policy covered damages "resulting from" wrongful acts "aris[ing] out of" the insured's business. Similarly, in *Franklin Packaging Co. v. California Union Insurance Co.,* 171 *N.J.Super.* 188, 190–92, 408 *A.*2d 448 (App.Div.1979), *certif. denied,* 84 *N.J.* 434, 420 *A.*2d 340 (1980), the court found damage to inventory was a loss proximately caused by

vandalism when that damage resulted from a sequence of events beginning with vandalism to a water valve and ending with damaged inventory because of a clogged drainpipe. *See also Westchester Fire Ins. Co. v. Cont'l Ins. Cos.*, 126 *N.J.Super.* 29, 37–38, 312 *A.*2d 664 (App.Div.1973) (equating phrases "caused by" and "resulting from" to proximate cause), *aff'd o.b.*, 65 *N.J.* 152, 319 *A.*2d 732 (1974). In those cases, the courts frequently referred to "Appleman's rule" on causation, which provides:

> Where a peril specifically insured against sets other causes in motion which, in an unbroken sequence and connection between the act and final loss, produces the result for which recovery is sought, the insured peril is regarded as the proximate cause of the entire loss.... In other words, it has been held that recovery may be allowed where the insured risk was the last step in the chain of causation set in motion by an uninsured peril, or where the insured risk itself set into operation a chain of causation in which the last step may have been an excepted risk.
>
> [5 John Alan Appleman, *Insurance Law & Practice*, § 3083, at 309–11 (1970).]

That approach has been specifically employed even when the applicable policy language required a "direct loss." *See, e.g., Stone v. Royal Ins. Co.*, 211 *N.J.Super.* 246, 248, 250–52, 511 *A.*2d 717 (App.Div.1986) (utilizing proximate-cause standard under homeowner's insurance policy where policy covered "direct loss ... caused by" specified risks); *Karadontes v. Cont'l Ins. Co.*, 139 *N.J.Super.* 599, 601 n.1, 354 *A.*2d 696 (Bergen County Ct.1976) (explaining term "[d]irect loss, as used in fire insurance policies," was equivalent of "proximate cause").

As noted by the majority below, those New Jersey decisions applying a proximate-cause test to find coverage under an insurance policy did so in circumstances where the loss ultimately sustained would have been covered by the policy except for an exclusionary clause. *Auto Lenders, supra,* 358 *N.J.Super.* at 37, 816 *A.*2d 1068; *see, e.g., Stone, supra,* 211 *N.J.Super.* at 252, 511 *A.*2d 717 (concluding insured's loss covered by policy provision even though "underground water, an excluded peril, started the loss-producing chain of causation[, because] the last event, [a] ruptured hose on [an] appliance, was a covered risk"). Thus, the question in those cases was not whether the *loss* fit within the

definition of the policy, but whether an exclusionary clause could act to nullify the fundamental coverage purportedly offered by the policy. In those circumstances, courts applied a proximate-cause analysis to resolve an apparent conflict in the policy language to fulfill the reasonable expectations of the insured. *E.g., Search EDP, supra,* 267 *N.J.Super.* at 543–44, 632 *A.*2d 286.

Ohio Casualty argues that this appeal presents a fundamentally different question than that confronted under our case law because the issue here is not whether coverage should apply when a facial conflict exists between a covered risk and an exclusion. Rather, it contends the Court must determine whether a harm appearing to fall entirely outside the ambit of coverage may be salvaged through the use of a proximate-cause test to find a covered loss. Because of the unique nature of the injuries caused by employee infidelity, it asserts that those "proximate cause cases" are entirely inapplicable to an employee dishonesty policy.

New Jersey courts have not considered whether the use of a proximate-cause test for evaluating the nature of a loss is appropriate under an employee-dishonesty policy that requires a direct loss. However, the majority of federal courts that have addressed this question have concluded that the term "direct loss" or its equivalent does, in fact, call for the application of a proximate-causation standard. *E.g., Scirex Corp. v. Fed. Ins. Co.,* 313 *F.*3d 841, 850 (3d Cir.2002) (applying proximate-cause test to "direct loss"); *Fed. Deposit Ins. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 205 *F.*3d 66, 76 (2d Cir.2000) (applying proximate-cause test to policy language covering "loss resulting directly from" employee dishonesty); *Resolution Trust Corp., supra,* 205 *F.*3d at 655–56 (same); *Jefferson Bank v. Progressive Cas. Ins. Co.,* 965 *F.*2d 1274, 1281–82 (3d Cir.1992) (same); *First Nat'l Bank of Louisville v. Lustig,* 961 *F.*2d 1162, 1167–68 (5th Cir.1992) (same). *But see Vons Cos., Inc. v. Fed. Ins. Co.,* 212 *F.*3d 489, 492–93 (9th Cir.2000) (affirming summary judgment for insurer under employee-dishonesty policy, finding " 'direct' means 'direct' " and holding that "in the absence of a third party claims

clause, [insured's] policy did not provide indemnity for vicarious liability for tortious acts of its employee"). In fact, the Third Circuit, examining New Jersey precedent, presaged that we would adopt the proximate-cause test in the context of employee-dishonesty coverage. *Resolution Trust Corp., supra,* 205 *F.*3d at 655.

In view of the prevailing approach taken by courts in New Jersey and elsewhere to defining direct loss, in whatever type of policy that term arose, we adopt the conventional proximate cause test as the correct standard to apply when determining whether a loss resulted from the dishonest acts of an employee. Our interpretation comports with our general principles of insurance law, including our practice of interpreting coverage provisions broadly. *See, e.g., Progressive Cas. Ins. Co. v. Hurley,* 166 *N.J.* 260, 273, 765 *A.*2d 195 (2001) (explaining that "policies should be construed liberally in the insured's favor to the end that coverage is afforded to the full extent that any fair interpretation will allow") (quotations and alterations omitted); *Gibson v. Callaghan,* 158 *N.J.* 662, 671, 730 *A.*2d 1278 (1999) (observing "clauses that extend coverage are to be viewed broadly and liberally"). There being no sound reason why a proximate-cause analysis should not be employed when determining whether a loss is direct under a fidelity insurance policy, we will apply that approach to such policies, including the policy at issue in this appeal.

B.

Turning to the present dispute, we conclude that Gentilini sustained a direct loss of Business Personal Property as the result of Carpenter's conduct when it was induced by his fraudulent acts to hand over automobiles in exchange for installment sales contracts signed by non-creditworthy customers. Those contracts represented a promise by the individual purchasers to pay money over time. The value of those promises, however, was dependent on the accuracy of the information provided by the individual purchasers because only accurate information allowed for a realistic evaluation of the risk of loss on each individual contract. By

producing fictitious pay stubs and drivers' licenses for twenty-seven applicants, Carpenter skewed the indicators used by both Gentilini and Auto Lenders to determine an applicant's creditworthiness, thereby exposing Gentilini to a risk of default it would not have been willing to accept in the absence of fraud. Thus, any loss to Gentilini resulting from the default of the purchasers on the sale of the automobiles was proximately, and therefore directly, the result of Carpenter's actions.

In addition, and perhaps more important from Gentilini's perspective, we observe that the accuracy of the information provided by the purchasers and Gentilini's employees in those contracts was crucial to the effective operation of Gentilini's business. As noted above, Gentilini was dependent on an assignment system to facilitate the sale of its automobiles; it entered into installment sales contracts with its customers with the knowledge that it would receive the financed portions of the sales from a lending institution such as Auto Lenders. Carpenter's actions disrupted that scheme because, under Gentilini's Dealer Agreement with its lenders, a condition for retaining the financed portion of its sales was that it provide accurate information about each purchaser. When Carpenter falsified the credit applications of twenty-seven individuals, he effectively rendered the resulting contracts unassignable to Auto Lenders, ultimately depriving Gentilini of possession of twenty-seven automobiles and the profit to be made on those vehicles.

Ohio Casualty argues that Gentilini cannot recover for losses related to the sale of the vehicles because "[a]utomobiles held for sale" are expressly excluded from coverage under its insurance policy. We disagree. A plain reading of the policy reveals that the exclusion on which Ohio Casualty seeks to rely does not apply to property covered under the employee-dishonesty section of the policy.

Section A.1. of the "Building and Personal Property Coverage Form" defines "Covered Property" as "the type of property described in this section, A.1., and limited in A.2., Property Not

Covered...." That section then lists various types of property falling within the coverage of the policy, including "Business Personal Property." Among the items listed as Business Personal Property is "Stock," which is defined as "merchandise held in storage or for sale...." Section A.2. of the coverage form, "Property Not Covered," explains that "Covered Property does not include: ... Automobiles held for sale[.]"

Were Gentilini's claim being brought for *Covered Property* under the Building and Personal Property Coverage Form, we would agree with Ohio Casualty that the automobiles are excluded from coverage because the definition of Covered Property, includ= ing Stock, is limited by section A.2., Property Not Covered. Gentilini, however, is bringing its claim against Ohio Casualty under the "Employee Dishonesty" section of the "Master Pak for Property," which, as we explained above, is an endorsement modifying the coverage provided by the Building and Personal Property Coverage Form. The Employee Dishonesty provision extends the insurance provided by the policy "to apply to direct loss of or damage to *Business Personal Property* and 'money' and 'securities' resulting from dishonest acts committed by any of your employees...." (Emphasis added.) Thus, under this policy provision, Gentilini is covered for losses of *Business Personal Property,* including merchandise held for sale, without the limitations that section A.2. elsewhere places on the definition of *Covered Property.*

In short, a plain reading of the policy reveals that Gentilini's *Business Personal Property* includes automobiles in its possession when they are held for sale. Policy provisions providing coverage for losses of *Covered Property* exclude losses of such vehicles by virtue of the limitations placed on the definition of Covered Property. The policy provision at issue here, however, insures against losses of Business Personal Property, not for losses of Covered Property. Accordingly, the exclusion pertaining to automobiles held for sale is inapplicable.

## IV.

Having determined that Gentilini suffered a direct loss, we next turn to questions regarding Carpenter's "manifest intent" as that term is used in the insurance policy.

■ "[T]he term 'manifest intent' refers to the employee's state of mind in engaging in the allegedly dishonest or fraudulent acts which the insured claims to have caused it a loss covered by the fidelity bond." *Resolution Trust Corp., supra,* 205 *F.*3d at 637. To recover from Ohio Casualty under the insurance policy, Gentilini must prove that Carpenter committed his dishonest actions with the manifest intent to cause Gentilini "to sustain loss or damage" and with the manifest intent to "[o]btain financial benefit (other than salaries, commissions, [or] fees . . . earned in the normal course of employment) for . . . [a]ny employee . . . or . . . [a]ny other person or organization."

### A.

The term manifest intent has been in use in employee fidelity bonds for over a quarter of a century. *Resolution Trust Corp., supra,* 205 *F.*3d at 638. It was first introduced into standard form insurance policies in the mid–1970s by the Surety Association of America in response to what the insurance industry perceived as an unwarranted expansion of fidelity coverage by the courts. Michael Keeley, *Employee Dishonesty Claims: Discerning the Employee's Manifest Intent,* 30 *Tort & Ins. L.J.* 915, 917–18 (1995). Specifically, the insurance industry was concerned that courts were expanding dishonesty coverage beyond its intended scope, at times finding coverage under a fidelity bond for an act of dishonesty with minimal regard to the employee's motive. *Id.* at 917; *see also* Jane Landes Foster et al., *Does a Criminal Conviction Equal Dishonesty? Criminal Intent Versus Manifest Intent,* 24 *Tort & Ins. L.J.* 785, 800 (Summer 1989) (explaining use of term manifest intent "represented a specific response to a growing number of decisions that judicially expanded the definition of dishonesty by recognizing claims based on reckless misconduct").

As explained by the Surety Association when it proposed changes to the standard fidelity insurance language:

> Some courts seem to confuse dishonesty and unfaithful performance of duties. We are ready and willing to insure against dishonesty, i.e., against improper acts of employees committed with an intent to deprive their employer of funds or property. We cannot insure against violations of instructions or poor business judgment.
>
> [Keeley, *supra,* 30 *Tort & Ins. L.J.* at 919 (quoting Sur. Ass'n of Am. Sub–Comm. Report, Revision of the Dishonesty Insuring Agreement of Form 24, at 1 (1976)).]

Although the use of "manifest intent" in fidelity bonds was intended to bring clarity to policies and, more specifically, to make clear those acts covered or excluded by the policy, the term quickly became a major battleground in employee-dishonesty coverage disputes. Christopher Kirwan, *Mischief or "Manifest Intent"? Looking for Employee Dishonesty in the Uncharted World of Fiduciary Misconduct,* 30 *Tort & Ins. L.J.* 183, 186 (Fall 1994). Because manifest intent was a new term in the industry and had not been defined in the insurance policies in which it was included, courts were left to interpret the meaning of the phrase with little or no guidance from the parties or precedent. *Ibid.* As a result, they developed several approaches to resolving an employee's manifest intent.

In general, three tests have emerged to determine whether an employee acted with the manifest intent necessary to have his or her actions fall within the coverage of an insurance agreement. The first approach, referred to as the objective approach, "focuse[s] on the natural consequences of an actor's conduct . . . but d[oes] not necessarily focus on the actor's actual state of mind." Toni Scott Reed, *Employee Theft Versus Manifest Intent: The Changing Landscape of Commercial Crime Coverage,* 36 *Tort & Ins. L.J.* 43, 55 (2000). This test "essentially equates manifest intent with recklessness," and in some cases "permits a fact finder to ignore all specific intent or testimony regarding intent in favor of [a] recklessness standard[.]" *Id.* at 57, 58. The second approach, characterized as the subjective or specific-intent approach, is the "opposite extreme" from the objective approach. *Id.* at 55.

When applying that test, "courts actually try to determine whether the actor in question specifically intended the resulting loss to the employer in question." *Ibid.* The third approach, "and perhaps the most prevalent standard currently applied," is the substantial-certainty test. *Ibid.* Like the subjective approach, the substantial-certainty test "focuses in part upon the subjective state of mind of the actor to determine whether manifest intent was present in light of all surrounding circumstances...." *Ibid.* As discussed in greater detail below, courts applying the latter two tests vary in the weight that they accord the subjective intent of the actor and the objective manifestations of that actor's intent.

Of the three approaches just discussed, a purely objective approach appears to be the least utilized by courts. The reluctance to apply that test appears to be motivated by the desire to avoid a return to the recklessness standard the insurance industry expressly attempted to supplant through the use of the manifest-intent language. Moreover, that approach seemingly ignores the actor's stated intent. *See, e.g., Fed. Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.,* 942 *F.*2d 1032, 1035 (6th Cir.1991) (noting that although intent "is thought to refer to a subjective phenomenon that takes place inside people's heads," law is concerned only with "external behavior ordinarily thought to manifest internal mental states"); *Nat'l Bank of Pak. v. Basham,* 142 *A.D.*2d 532, 531 *N.Y.S.*2d 250, 251 (1st Dep't 1988) (considering only external behavior to determine whether bank employee acted with manifest intent to harm bank), *aff'd o.b.* 73 *N.Y.*2d 1000, 541 *N.Y.S.*2d 345, 539 *N.E.*2d 101 (1989).

Like other courts that have rejected this approach, we believe that the internal, subjective intent of the actor is relevant, if not critical, to a manifest-intent analysis. Accordingly, we do not believe that a purely objective approach is the appropriate way to determine an individual's manifest intent.

The two remaining approaches, the substantial-certainty test and the specific-intent test, have divided the federal circuits. For

example, the Second, Fourth, and Fifth Circuits have adopted a specific-intent approach, concluding that for coverage to apply the employee must have acted "with the specific purpose or desire to both injure the insured and obtain a benefit." *Resolution Trust Corp., supra,* 205 *F.*3d at 639 (citing *General Analytics Corp. v. CNA Ins. Cos.,* 86 *F.*3d 51, 54 (4th Cir.1996); *Lustig, supra,* 961 *F.*2d at 1166–67; *Glusband v. Fittin Cunningham & Lauzon, Inc.,* 892 *F.*2d 208, 210–12 (2d Cir.1989); *Leucadia, Inc. v. Reliance Ins. Co.,* 864 *F.*2d 964, 972–74 (2d Cir.1988), *cert. denied,* 490 *U.S.* 1107, 109 *S.Ct.* 3160, 104 *L.Ed.*2d 1023 (1989)); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, supra,* 205 *F.*3d at 73 (reaffirming Second Circuit's commitment to specific-intent approach). Other circuits, such as the Sixth, Seventh, and Tenth Circuits, have concluded that the manifest-intent standard "does not necessarily require that the employee actively wish for or desire a particular result," but can be satisfied so long as the employee knew "a particular result is substantially certain to follow from conduct." *Resolution Trust Corp., supra,* 205 *F.*3d at 638 (citing *Peoples Bank & Trust Co. v. Aetna Cas. & Sur. Co.,* 113 *F.*3d 629, 635 (6th Cir.1997); *Fed. Deposit Ins. Corp. v. Oldenburg,* 34 *F.*3d 1529, 1539 (10th Cir.1994); *Fed. Deposit Ins. Corp. v. United Pac. Ins. Co.,* 20 *F.*3d 1070, 1078 (10th Cir.1994); *Heller Int'l Corp. v. Sharp,* 974 *F.*2d 850, 857–59 (7th Cir.1992); *St. Paul Fire & Marine Ins. Co., supra,* 942 *F.*2d at 1035) (internal quotation marks omitted)). Because this "standard is satisfied *either* by proof of the employee's desire to cause a loss or by proof that the loss was 'substantially certain' to result," it has been viewed as "embrace[ing] a different, and less culpable mental state, than if the standard *required* that the evidence show that it was the employee's specific purpose or desire to cause the insured to sustain the loss and obtain a financial benefit at the insured's expense." *Id.* at 639.

In the midst of this chaotic legal landscape, the Third Circuit was charged with predicting how this Court would identify the meaning of manifest intent under New Jersey law. *Id.* at 637. After exploring the origins of the manifest-intent language, the

court set out the cases adopting the substantial-certainty and specific-intent approaches. *Id.* at 638–41. It explained that the substantial-certainty test could be loosely analogized to "the Model Penal Code's mental state 'knowingly,' as a person acts knowingly under the Model Penal Code if he or she is aware that 'a result is practically certain to follow from his conduct, whatever his desire may be as to the result.'" *Id.* at 639 (citing Keeley, *supra*, 30 *Tort & Ins. L.J.* at 923–24) (internal quotation marks omitted); *see also N.J.S.A.* 2C:2–2(b)(2) ("A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result."). By contrast, it noted that the specific-intent approach was more akin to the "purposefully" standard of the Model Penal Code, *id.* at 642, which is satisfied if an actor "consciously desires that result, whatever the likelihood of that result happening from his conduct." *United States v. Bailey,* 444 *U.S.* 394, 404, 100 *S.Ct.* 624, 631, 62 *L.Ed.*2d 575 (1980) (internal quotation marks omitted); *accord N.J.S.A.* 2C:2–2(b)(1).

After completing its thorough analysis of the case law on this question, the Third Circuit stated the critical distinction between the two approaches:

> As is evident from our discussion, under either approach, evidence tending to show that the employee acted "knowingly" would support a jury finding that the employee intended the consequences of his actions. Nevertheless, under the rationale [of the specific-intent approach], proof of an employee's recklessness, or an employee's knowledge that a result was substantially certain to occur from the conduct, are objective indicia—manifestations—of the employee's specific purpose or intent. But neither an employee's recklessness or his knowledge that a result was substantially certain to occur would satisfy the language of the policy, absent that inference of specific intent. In contrast, those courts that have equated the term "intent" with the mental state "knowingly" would find that the employee acted with the manifest intent where the loss and the benefit were substantially certain to follow, regardless of whether the employee desired such results.
>
> [*Resolution Trust Corp., supra,* 205 *F.*3d at 641–42 (internal citation omitted).]

Thereafter, the court concluded that this Court would adopt the specific-intent test, reasoning that that approach "better capture[d] the meaning of 'intent' as it [is] used in the fidelity

provision, given the history that prompted its inclusion in the dishonesty definition and its stated purpose." *Id.* at 642.

The court went on to emphasize, however, that although its approach "require[d] proof of the employee's purpose in engaging in the dishonest or fraudulent acts," it remained "cognizant that the employee's actual subjective state of mind [was] virtually impossible to prove absent resort to circumstantial evidence— objective indicia of intent." *Ibid.* Accordingly, it held that to the extent

> proof of recklessness and/or the employee's knowledge of the likelihood that a loss was to result both serve as manifestations of the employee's specific purpose or design, . . . a jury may consider those factors, along with any other objective indicia of intent, in ascertaining the employee's state of mind in engaging in the wrongful conduct.
>
> [*Id.* at 643.]

It reasoned that such an approach "str[uck] an appropriate balance because it comports with the drafters' obvious intent to limit the types of employee misconduct covered by this provision but ensures that proof of the employee's recklessness and the substantial likelihood of loss factor into the ultimate inquiry into the employee's subjective state of mind." *Id.* at 642.

### B.

The question of how to determine an employee's manifest intent has engendered, and will undoubtedly continue to spawn, considerable debate in the legal community. As is evidenced by our brief survey of the case law addressing this issue, reasonable minds differ on the meaning of this seemingly innocuous term.

Ultimately, however one chooses to label the approach taken in any given case, the decisions on manifest intent fall along a continuum between a purely objective approach and a purely subjective approach. Bearing in mind that continuum and the subtle distinctions separating the approaches adopted in the foregoing cases, we conclude that the substantial-certainty test best comports with our understanding of manifest intent. Thus, we hold that the manifest-intent standard is satisfied either by proof

that it was an employee's purpose or desire to cause the insured to sustain a loss and to obtain a financial benefit at the insured's expense, or by proof that the employee knew the aforesaid loss and benefit were substantially certain to result from his or her conduct.

■ Although we recognize the implicit appeal of the Third Circuit's approach, one that requires an employee to act with a specific purpose but that allows a fact finder to infer that purpose from the objective manifestations of that employee's intent, several reasons lead us to believe that manifest intent is more appropriately defined by the substantial-certainty approach. First, defining manifest intent in terms of the employee's substantial certainty that a given loss or benefit will follow from his or her conduct is consistent with our general approach to questions of intent. For example, in the context of a worker's compensation action, we explained that "an intentional wrong is not limited to actions taken with a subjective desire to harm, but also includes instances where an employer knows that the consequences of those acts are substantially certain to result in such harm." *Laidlow v. Hariton Mach. Co.*, 170 *N.J.* 602, 613, 790 *A.2d* 884 (2002) (citing W. Prosser & W. Keeton, *The Law of Torts*, § 80, at 569 (5th ed.1984)); *see also Millison v. E.I. du Pont de Nemours & Co.*, 101 *N.J.* 161, 177–78, 501 *A.2d* 505 (1985) (same). Similarly, in *Birchwood Lakes Colony Club, Inc. v. Borough of Medford Lakes*, 90 *N.J.* 582, 592, 449 *A.2d* 472 (1982), we concluded that the invasion of an interest in the private use and enjoyment of land is intentional, for the purpose of liability for a private nuisance, "if the actor purposefully causes it or knows that the invasion is substantially certain to result from his conduct." *Cf. Wilson v. Amerada Hess Corp.*, 168 *N.J.* 236, 254, 773 *A.2d* 1121 (2001) (observing "what a persons intentions were need not be proved from what he said, but they may be inferred from all that he did and said, and from all the surrounding circumstances of the situation under investigation") (alterations and

quotations omitted). Thus, we have often defined intent in terms of the certainty that the conduct will bring about a particular result.

Second, the word "intent" in this policy is modified by the adjective "manifest." Virtually all of the cases addressing this question "have interpreted the term 'manifest' as meaning that the intent of the employee must be 'apparent or obvious.'" *Resolution Trust Corp., supra,* 205 *F.*3d at 637 (citing *Oldenburg, supra,* 34 *F.*3d at 1539; *St. Paul Fire & Marine Ins. Co., supra,* 942 *F.*2d at 1035; *N. Jersey Savs. & Loan Ass'n v. Fid. & Deposit Co.,* 283 *N.J.Super.* 56, 65, 660 *A.*2d 1287 (Law Div.1993); 11 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* 3d § 161:3 (1998)). The use of this word thus begs the question: to whom must the employee's intent be apparent or obvious? Viewed from the perspective of the insurer and insured, the parties to the insurance contract, when an employee engages in conduct that he or she knew was substantially certain to cause the employer to suffer a loss, it would seem apparent or obvious that the employee intended to cause the resulting loss. *See Hanson PLC v. Nat'l Union Fire Ins. Co. of Pittsburgh,* 58 *Wash.App.* 561, 794 *P.*2d 66, 72 (1990) (explaining "[a] secret intent is of no consequence" because manifest intent must be apparent or obvious); *see also Black's Law Dictionary* 814 (7th Ed.1999) (defining manifest intent as "[i]ntent that is apparent or obvious based on the available circumstantial evidence" and explaining that requisite intent will be inferred when "result was substantially certain to follow from the employee's conduct").

Finally, our fundamental rules of insurance contract interpretation require us to read coverage provisions broadly, *Callaghan, supra,* 158 *N.J.* at 671, 730 *A.*2d 1278, and to interpret ambiguities "to comport with the reasonable expectations of the insured, even if a close reading of the written text reveals a contrary meaning," *Zacarias v. Allstate Ins. Co.,* 168 *N.J.* 590, 595, 775 *A.*2d 1262 (2001); *see also Mazzilli v. Accident Cas. Ins. Co.,* 35 *N.J.* 1, 7, 170 *A.*2d 800 (1961) (explaining that court should find broadest coverage possible under insurance policy when

controlling language is susceptible to multiple interpretations). As evidenced by our discussion of the divergent opinions across the country on the meaning of manifest intent, the term is susceptible to multiple interpretations that, depending on the facts giving rise to a claim, will affect the scope of coverage. In view of that divergence, and bearing in mind our obligation "to protect the insured to the full extent that any fair interpretation [of the policy] will allow[,]" *Mazzilli, supra,* 35 *N.J.* at 7, 170 *A.*2d 800, we believe that the substantial-certainty test best comports with the insureds reasonable expectations.

We are mindful that when a court construes an ambiguous clause in an insurance policy, it "should consider whether more precise language by the insurer, had such language been included in the policy, 'would have put the matter beyond reasonable question.' " *Gibson, supra,* 158 *N.J.* at 670, 730 *A.*2d 1278 (quoting *Doto v. Russo,* 140 *N.J.* 544, 557, 659 *A.*2d 1371 (1995)). For future guidance, we note that had Ohio Casualty wanted to ensure that coverage under this policy would be limited to circumstances where the employee acted with the specific intent to harm the employer and benefit himself or another, it could have done so by replacing the term "manifest intent" with the phrase "specific intent or desire." That language would have left no ambiguity that it intended to provide coverage only when it was an employee's conscious object or desire to bring about the resulting benefit and harm.

## C.

Turning to the facts of the present appeal, we conclude that summary judgment should not have been granted for either party. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." *R.* 4:46–2(c). In determining whether there exists a genuine issue of material fact

that precludes summary judgment, a court must consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

When the intent of an employee is at issue in a fidelity action, in certain circumstances the nature of the employee's dishonest act itself will definitively demonstrate the employee's intent. As the Second Circuit recently explained, a dishonest employee's conduct may fall along a "continuum of behavior ranging from behavior manifesting an obvious intent to cause a loss to behavior that does not indicate the employee intended to harm the insured." *Nat'l Union Fire Ins. Co., supra,* 205 *F.*3d at 72. It continued:

> An embezzler, at one end of the continuum, necessarily intends to cause the employer the loss, since the employee's gains are directly at the employer's expense. At the other end of the continuum, not triggering fidelity coverage, is the situation where the employee's dishonesty at the expense of a third-party is intended to benefit the employer, since the employee's gain results from the employer's gain. Under such circumstances, even if the employer suffers a loss, fidelity coverage is not triggered.
>
> [*Ibid.* (internal quotation marks and citations omitted); *see also Lustig, supra,* 961 *F.*2d at 1165–66 (defining similar continuum of conduct).]

When the employee's conduct lies somewhere in the middle of the continuum, intent becomes a disputed issue of fact generally not appropriate for disposition through summary judgment. *Nat'l Union Fire Ins. Co., supra,* 205 *F.*3d at 72; *see also Oldenburg, supra,* 34 *F.*3d at 1540 ("[W]here an individual's conduct falls somewhere between the two extremes of embezzlement and simple poor judgment, intent becomes a question of fact which will generally not be subject to summary judgment.") (internal quotation marks omitted).

On the record before us, it appears that the present dispute falls somewhere between an act of pure embezzlement, which would plainly satisfy the manifest-intent requirement, and the exercise of poor business judgment, which would not be covered under an employee-fidelity policy. Construing the evidence in favor of the

non-moving party on the motion and cross-motion for summary judgment, we conclude that the materials presented would permit a rational fact-finder to resolve the alleged disputed issue in favor of the non-moving party in each instance.

With respect to Carpenter's manifest intent to harm Gentilini, neither side has offered more than sheer conjecture regarding Carpenter's intent when he falsified credit applications on behalf of the individual borrowers. For example, Ohio Casualty asserts that it is "plain and obvious" that Carpenter's intent was not to harm Gentilini but to benefit both his employer and himself, noting that Gentilini "presumably" profited from the sale of the cars and assignment of its installment contracts to Auto Lenders. However, as noted above, *supra* at 259–60, 854 *A*.2d at 387, Carpenter's act of fabricating credit information ultimately burdened Gentilini with the risk of default on twenty-seven installment sales contracts and deprived it of possession of those automobiles. Because the applicants with whom Carpenter was dealing posed a heightened risk of defaulting on their payment obligations, a jury could infer from Carpenter's conduct and the surrounding circumstances that he intended Gentilini to suffer any and all losses resulting from such defaults. *See Lustig, supra,* 961 *F*.2d at 1166 ("When an employee obtains fraudulent loans with reckless disregard for a substantial risk of loss to the bank, a jury may infer from his reckless conduct and surrounding circumstances that he intended to cause that loss."); *see also Resolution Trust Corp., supra,* 205 *F*.3d at 643 (explaining jury may consider "recklessness and/or [an] employee's knowledge of the likelihood that a loss was to result . . ., along with any other objective indicia of intent, in ascertaining the employee's state of mind in engaging in the wrongful conduct").

In that same vein, although Gentilini argues that Carpenter's conduct satisfies the manifest-intent requirement, a jury looking at the facts in a light most favorable to Ohio Casualty might well conclude that Carpenter did not act with the conscious purpose to harm Gentilini and that Gentilini's losses were not substantially

certain to follow from his conduct. Carpenter's scheme depended on Auto Lenders accepting applications with falsified information. The longer he could perpetrate the fraud on Auto Lenders the more sales, and thus the more commissions, Carpenter could garner for Gentilini and himself. Because the losses Gentilini ultimately sustained depended on Auto Lenders uncovering Carpenter's fraud, a jury could conclude that Carpenter did not intend Gentilini to suffer a loss because that result would be completely counterproductive to Carpenter's rational goal of maximizing his commissions. *See Lustig, supra,* 961 *F.*2d at 1166 (recognizing that "[a]n employee may use fraudulent documents for loans, believing that they would be successfully paid, without manifest intent to cause ... a loss"). Although Gentilini argues the loss was substantially certain to follow from Carpenter's actions because his pattern of conduct was so "egregious and blatant" that Carpenter knew Auto Lenders was bound to uncover his scheme, that conclusion rests on the assumption that Carpenter knew about the repurchase obligation of the Dealer Agreement (a fact not established in the present record) and also presents a question of fact for the jury's determination. Therefore, on the proofs presented, neither party was entitled to summary judgment on the issue of intent to harm Gentilini.

Lastly, the proofs with respect to Carpenter's intent to benefit himself or a third party are also insufficient to warrant summary judgment. Ohio Casualty asserts that the only financial benefit Carpenter could have intended by his scheme would have been to earn increased compensation for the automobile sales, a benefit expressly excluded from coverage by the policy. *See, e.g., Resolution Trust Corp., supra,* 205 *F.*3d at 648 (noting courts considering issue of fraudulently-earned commissions have concluded exclusion applies, "finding that the term 'earned' encompasses financial benefits both fraudulently obtained and honestly earned from the employer"). Gentilini concedes that the present record does not disclose whether or not Carpenter obtained any benefit other than commission from the sale of the automobiles. It argues, however, that Carpenter's conduct satisfied the manifest-intent requirement

because he provided benefits to the less-creditworthy purchasers by putting them behind the wheels of cars they would not have been able to own without Carpenter's fraudulent scheme. Although we doubt that Carpenter perceived of himself as a modern-day Robin Hood, taking from Gentilini and giving to non-credit-worthy customers, a reasonable jury could conclude that Carpenter knew his conduct was substantially certain to result in a benefit to those purchasers.[2]

Moreover, the certification of Thomas Eidell, one of the twenty-seven purchasers using falsified application information, reveals that in at least one transaction Carpenter had a personal connection with a credit applicant; Eidell was put into contact with Carpenter by Terry Craig, a Gentilini salesperson and a long-time friend of Eidell. It would not be unreasonable for a jury to conclude that Carpenter acted with the manifest intent to benefit Craig by helping Eidell secure financing for a new automobile.[3] Thus, like the question of Carpenter's manifest intent to harm, whether Carpenter intended to benefit himself or a third party remains a question that must be resolved by a jury.

## V.

The final issue under this insurance policy for our consideration is whether Carpenter's dishonest acts constitute a single occur-

---

[2] Ohio Casualty argues that this lending arrangement was not a benefit to the purchasers because of the large cash down payments required to obtain the cars and the extraordinarily high rates of interest (close to a twenty-one percent annual percentage rate) placed on the loans. That argument rests on semantics and ignores the fact that the purchasers took possession of automobiles they otherwise would have been unable to afford.

[3] Gentilini's third-party complaint also suggests that other individuals may have been complicit in the fraud. Specifically, it states that two individuals, "while acting outside the scope of their duties as independent contractors for their own pecuniary gain," caused the eventual losses. The parties have not clarified what role, if any, these individuals may have had in Carpenter's scheme or if they received a benefit from Carpenter not otherwise excluded from coverage by the policy.

rence or multiple occurrences for coverage purposes. The insurance policy specifies that "[a]ll loss or damage: (1)[c]aused by one or more persons; or (2)[i]nvolving a single act or series of related acts; is considered one occurrence."

Gentilini argues that the trial court and the dissent below were correct when they concluded that each of Carpenter's twenty-seven acts of fraud were separate occurrences under the policy. Relying on *Doria v. Insurance Co. of North America*, 210 *N.J.Super.* 67, 74, 509 *A.*2d 220 (App.Div.1986), it maintains that a series of events constitutes a single occurrence only if they are so closely linked in time and space that an average person would consider them one event. It asserts that Carpenter's acts, which were committed over a span of eleven months, were not close enough in time and space to constitute one occurrence. Accordingly, it alleges that not one but twenty-seven acts of fraud were committed.

Focusing on the policy's definition of "occurrence," Ohio Casualty counters with two arguments. First, it asserts that the plain language of subpart (1), above, "limits occurrences to one per employee/wrongdoer," thereby making the maximum recovery for all of Carpenter's actions $5000. Second, it contends that Gentilini's arguments are unsupportable because, under subpart (2), above, an "occurrence" is not limited to a single event, but rather expressly includes all loss arising from a "series of related acts." Building on that definition, it claims that Carpenter's conduct constitutes one occurrence because the twenty-seven sales he orchestrated were part of an ongoing scheme to defraud Auto Lenders and Gentilini, in which he used the same facilities and methodology, and caused losses to the same victim.

In addition to the policy's language, Ohio Casualty argues that construing Carpenter's conduct as multiple occurrences would have negative public-policy implications. Specifically, it points to cases involving coverage under similar policies against acts of embezzlement, when, as often occurs in cases of petty employee theft, embezzlers steal in amounts below the deductible. Citing an

example offered in *American Commerce Insurance Brokers, Inc. v. Minnesota Mutual Fire & Casualty Co.*, 551 *N.W.*2d 224, 229 (Minn.1996), it notes that if an employee embezzled $100 from a company on 155 separate occasions, but that policy had a $250 per occurrence deductible, under Gentilini's approach the company would not be entitled to any protection under the policy. It thus maintains that the plain terms of the policy and public policy dictate that we conclude there was no more than one occurrence and that Gentilini's recovery, if any, must be limited to $5000 less the applicable deductible.

After considering the record and the definition contained in the policy, we conclude that the twenty-seven automobile sales were twenty-seven separate occurrences under the policy. With respect to subpart (1) of the policy, we agree with Judge Wecker that, read literally, the occurrence provision would limit all losses for employee dishonesty to a single $5000 maximum because losses of that type must, by their very nature, be "[c]aused by one or more persons." *Gentilini, supra*, 358 *N.J.Super.* at 40 n.4, 816 *A.*2d 1068. When the provisions of the text, read literally, would largely nullify the protections afforded by the policy, we restrict their meaning "so as to enable fair fulfillment of the stated policy objective." *Kievit v. Loyal Protective Life Ins. Co.*, 34 *N.J.* 475, 483, 170 *A.*2d 22 (1961). We, therefore, will not adhere to the text's literal limitation because to do so here would nearly vitiate the coverage that both parties clearly contemplated. Instead, we conclude that a fair reading of that provision simply means that for each loss of property covered by the policy there can be only one recovery, regardless of the number of employees that may have caused the loss.

With regard to the second subpart of the occurrence language, we conclude that although Carpenter may have acted in the same manner when perpetrating each fraudulent sale, for each sale he caused a separate, direct loss of property to Gentilini by inducing it to part with an automobile in exchange for a faulty installment sales contract. *See, e.g., Appalachian Ins. Co. v. Liberty Mut.*

*Ins. Co.,* 676 *F.*2d 56, 61 (3d Cir.1982) (explaining that issue whether losses were caused by single occurrence or multiple occurrences is determined by reference to cause of loss). Each separate sale, therefore, was a direct loss triggering a separate occurrence under the policy.

Judge Wecker correctly observed that "[t]he common pattern of these transactions cannot fairly be said to turn them into a single event." *Gentilini, supra,* 358 *N.J.Super.* at 47, 816 *A.*2d 1068. As noted above, the sales did not involve "a single act or series of related acts," but were distinct sales to separate purchasers, for separate automobiles. Even though Carpenter may have employed similar techniques for each fraud-induced sale, the fact remains that, by virtue of Carpenter's conduct, Gentilini was required to relinquish possession of twenty-seven cars on twenty-seven separate occasions to twenty-seven distinct customers.

We are not persuaded that this case is analogous to *American Commerce Insurance Brokers, supra,* or any of the myriad of embezzlement-type cases where an employee steals cash or checks from an employer as part of an ongoing scheme to defraud. In these circumstances, in which each purchaser and the terms of each sale are unique, the similarity of the acts do not transform them into one continuous event subject to a single recovery under the policy. *See, e.g., N. River Ins. Co. v. Huff,* 628 *F.Supp.* 1129, 1133–34 (D.Kan.1985) (finding that several loan transactions involving same manner of financing were separate occurrences because transactions "occurred at separate times, involved different borrowers, were for different purposes, and had separate collateral"). Accordingly, we hold that Gentilini is entitled to recover up to $5000 for each fraudulently induced sale, subject to any applicable deductibles under the policy.

## VI.

If, at trial, the jury finds that Carpenter had the requisite "manifest intent" to harm Gentilini and benefit himself or a third party, Gentilini still bears the burden of proving damages as

measured by the losses resulting from the fraudulently induced sales. Although we conclude that Carpenter's conduct directly caused Gentilini's damages by fraudulently inducing it to enter into installment sales contracts and causing it to lose profits on the sale of automobiles, we do not agree with Gentilini that its $215,000 settlement payment to Auto Lenders is necessarily an accurate measure of direct loss under the terms of the insurance policy. Strictly speaking, that amount constitutes Gentilini's liability as a result of Carpenter's fraud, but it does not take into account assets that may still be at Gentilini's disposal to mitigate damages.

At this juncture, it is thus unclear whether the amount of the settlement is an accurate measure of Gentilini's losses. When Auto Lenders initially brought suit against Gentilini to enforce its contractual rights, it demanded that the dealership repurchase all of the outstanding installment contracts from it for the aggregate unpaid balance of $831,932.90. Two years later, Gentilini settled Auto Lender's claims by way of stipulation for $215,000. That stipulation, however, does not explain how the parties reached the $215,000 figure or what it was intended to represent in terms of the specific claims asserted by Auto Lenders (*e.g.*, claims for all outstanding contracts or just claims on the fraud-induced contracts). Moreover, it does not reveal whether Gentilini received the twenty-seven fraudulently-induced installment contracts from Auto Lenders as part of its repurchase obligations under the Dealer Agreement, and, most critically, does not explain what happened to the twenty-seven automobiles and whether the buyers continued to make payments thereon.

Although we have ascertained from the limited record before us that Gentilini suffered a direct loss of or damage to twenty-seven automobiles when it exchanged those vehicles for installment contracts of an otherwise unacceptable risk, the extent of its losses must be determined through further proceedings. Representations by counsel during oral argument suggest that the $215,000 payment constituted the value of the "entire portfolio" of fraudu-

lent contracts, that is, the outstanding balance for the twenty-seven contracts resulting from Carpenter's fraud. But there is no indication in the record whether Gentilini received that portfolio of contracts back from Auto Lenders as part of the settlement agreement and began receiving payments from the buyers, facts that will greatly affect the amount of losses it can recover.

For example, if Gentilini received the twenty-seven contracts back from Auto Lenders as part of its repurchase obligation under the Dealer Agreement, then its losses must be determined based on the remaining value of each installment contract. With respect to those customers in default at the time Gentilini reacquired the installment contracts, Gentilini's losses would be measured by determining the total buyback value of the contracts less any mitigation of damages obtained through Gentilini's successful enforcement of its security interest in the subject vehicles. For purchasers still in repayment at the time Gentilini reacquired the installment contracts, the losses Gentilini suffered, if any, would depend on whether the purchasers are still performing on their repayment obligations, the amount outstanding on each loan if a customer subsequently defaults, and the value of the automobiles should Gentilini successfully repossess vehicles from the defaulting purchasers. Concerning those contracts where the purchasers successfully fulfilled their obligations, Gentilini will not have suffered any damages as the consequence of Carpenter's conduct.

On the other hand, it is possible that Auto Lenders retained the twenty-seven installment sales contracts as an unwritten condition of the settlement. In that scenario, Gentilini would need to demonstrate how the $215,000 settlement figure was reached, what portions of that figure can be allocated to each fraud-induced contract, and whether the total losses on each contract took into account Auto Lender's security interest in the vehicles. Only then could Gentilini's direct losses be accurately assessed.

In sum, the measure of the direct loss caused by Carpenter's fraudulent acts, which deprived Gentilini of twenty-seven automobiles, is the loss Gentilini suffered for having undertaken install-

ment sales contracts at higher-than-acceptable levels of risk. The losses it incurred as a result of each fraudulent act, however, depend on whether Gentilini still has an interest in those contracts, the amount outstanding on those contracts that have entered default, and Gentilini's ability to mitigate its losses through repossession. Gentilini will have the burden of proving its loss on each contract through further proceedings.

## VII.

Finally, we briefly turn to the issue of attorneys' fees.

Gentilini concedes that the trial court's award of attorneys' fees incurred in defending the Auto Lenders litigation was unfounded. It argues, however, that it is entitled to fees incurred while prosecuting its claim against Ohio Casualty.

The issue of attorneys' fees was not grounds for the dissent below. As such, the question whether Gentilini is entitled to attorneys' fees for pursuing coverage under its policy is not before us as of right. *R.* 2:2–1(a)(2). In the interest of clarity on remand, however, we note that had the issue been properly preserved for our review, we would hold that attorneys' fees for Gentilini's claim against Ohio Casualty are not warranted.

Gentilini relies on *Rule* 4:42–9(a)(6), which permits the award of attorneys' fees "[i]n an action upon a *liability or indemnity policy* of insurance, in favor of a successful claimant." (Emphasis added.) By contrast, the Rule does *not* apply when the "insured … brings direct suit against his insurer to enforce casualty or other direct coverage." *Eagle Fire Prot. Corp. v. First Indem. of Am. Ins. Co.,* 145 *N.J.* 345, 363, 678 *A.*2d 699 (1996) (citation omitted); *see also Giri v. Medical Inter–Ins. Exchange of N.J.,* 251 *N.J.Super.* 148, 151, 597 *A.*2d 561 (App.Div. 1991) (observing that rule does not authorize attorneys' fees to enforce first-party coverage). Because the policy under which Gentilini seeks coverage protects *Gentilini* in the context of employee dishonesty and does not concern liability to *third par-*

*ties,* it does not fall within the ambit of the Rule. Application of the "American Rule," in which the parties to litigation should each bear their own legal costs, is appropriate in this case. *Coleman v. Fiore Bros., Inc.,* 113 *N.J.* 594, 596, 552 *A.*2d 141 (1989). Accordingly, Gentilini is not entitled to an award of attorneys' fees incurred in prosecuting its action against Ohio Casualty.

## VII.

The judgment of the Appellate Division is affirmed in part and reversed in part. The matter is remanded to the Law Division for further proceedings consistent with this opinion.

*For affirmance in part/reversal in part/remandment*—Chief Justice PORITZ and Justices VERNIERO, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Opposed*—None.