SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| EMPLOYERS MUTUAL CASUALTY COMPANY, an Iowa corporation, | ) ) ) | Arizona Supreme Court No. CV-07-0280-PR |
| Plaintiff/Counterdefendant/ Appellant, | ) ) ) ) | Court of Appeals Division One No. 1 CA-CV 05-0702 |
| v. | ) ) | |
| DGG & CAR, INC., d/b/a METROL SECURITY SERVICES, an Arizona corporation, | ) ) ) ) | Maricopa County Superior Court No. CV2003-004967 |
| Defendant/Counterclaimant/ Appellee. | ) ) ) | |
| _____ | ) ) ) | **O P I N I O N** |

Appeal from the Superior Court in Maricopa County
The Honorable Paul A. Katz, Judge

**REVERSED AND REMANDED**
_____

Memorandum Decision of the Court of Appeals, Division One
Filed Dec. 14, 2006

**VACATED**
_____

RAYMOND, GREER & SASSAMAN, P.C.                          Phoenix
     By    Randy L. Sassaman
           Michael J. Raymond
Attorneys for Employers Mutual Casualty Company

FEOLA & TRAICA, P.C.                                     Phoenix
     By    Steven Feola
           Robert J. Traica
And

Richard A. Alcorn                                       Phoenix
Attorneys for DGG & CAR, Inc., d/b/a
Metrol Security Services

_____

**R Y A N**, Justice

¶1     Businesses sometimes buy employee fidelity or commercial crime insurance policies to protect them against loss from employee theft.  In this case we must determine whether a standard form insurance policy treats the loss from a series of thefts by a single employee as one occurrence.

**I**

**A**

¶2     The facts crucial to our decision are not in dispute. In 2002, DGG & CAR, Inc., doing business as Metrol Security Services ("Metrol"), discovered that John Wallace Brown, an accounting employee, had embezzled more than $500,000 during a five-year period by forging company checks.

¶3     Metrol had purchased employee fidelity policies from Employers Mutual Casualty Co. ("EMC") covering two plan years, 2000-2001 and 2001-2002.  Under the policies, EMC agreed that it would "pay for loss of, and loss from damage to, Covered Property resulting directly from the Covered Cause of Loss." Covered property included money; the "Covered Cause of Loss" was "Employee dishonesty."  The policy defined "Employee dishonesty" as "dishonest acts committed by an 'employee' . . . with the manifest intent to" cause loss and obtain a financial benefit.

2

¶4      The EMC policy promised that EMC would "pay . . . for loss that you sustain through acts committed or events occurring at any time and discovered by you during the Policy Period." Such coverage was limited, however, to a set amount per occurrence of loss.  Under the policy, "[t]he most [EMC] will pay for loss in any one 'occurrence'" was $50,000, with a $250 deductible.  In turn, the policy defined "Occurrence" as meaning "all loss caused by, or involving, one or more 'employees,' whether the result of a single act or series of acts."  This latter provision became the focus of the dispute between Metrol and EMC.

**B**

¶5      Metrol filed a claim with EMC seeking reimbursement for the full amount of the company's loss, arguing that each act of theft was a separate occurrence.  EMC countered that Brown's series of thefts constituted a single occurrence and thus Metrol was entitled only to $50,000.

¶6      EMC filed a declaratory judgment action seeking a ruling that it owed only $50,000.  Metrol counterclaimed, alleging breach of contract, bad faith, and other claims. Cross-motions for summary judgment grappling with the definition of occurrence followed.  The superior court concluded that the policy was ambiguous as to whether each act of theft attributable to Brown was itself an occurrence, or whether all

3

acts of theft were a single occurrence. The court concluded Metrol was entitled to recover up to $50,000 for each theft. The parties eventually agreed to a stipulated judgment in favor of Metrol, conditioned on EMC's right to appeal the superior court's resolution of the cross-motions for summary judgment.

¶7        In a memorandum decision, the court of appeals reversed. *Employers Mut. Cas. Co. v. DGG & CAR, Inc.*, 1 CA-CV 05-0702, ¶ 1 (Ariz. App. Dec. 14, 2006) (mem. decision). The court reasoned that a series of thefts committed by one employee constituted one occurrence. *Id.* at ¶ 19. Consequently, the court concluded that Metrol's recovery was subject to the policy limit of $50,000 for the series of thefts. *Id.* at ¶ 33.

¶8        We granted Metrol's petition for review because this case concerns a matter of first impression in Arizona and because the definition of "occurrence" in the policy commonly appears in employee fidelity or commercial crime insurance policies.[1]  *See* ARCAP 23(c)(3).  We have jurisdiction under Article 6, Section 5 of the Arizona Constitution and Arizona Revised Statutes, ("A.R.S.") section 12-120.24 (2003).

## II

¶9        The interpretation of an insurance contract is a question of law we review de novo. *Sparks v. Republic Nat'l*

---

[1]      *See* Edward Gallagher, *Limit of Liability*, *in Commercial Crime Policy* 451 (Randall I. Marmor & John J. Tomaine, 2d ed. 2005).

4

*Life Ins. Co.*, 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982). In interpreting an insurance policy, we apply "a rule of common sense" thus, "when a question of interpretation arises, we are not compelled in every case of apparent ambiguity to blindly follow the interpretation least favorable to the insurer." *State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 257, 782 P.2d 727, 733 (1989) (stating ambiguity exists when policy "presents conflicting reasonable interpretations"). "[N]either language nor apparent ambiguity alone is dispositive." *Id.* Rather, even if a policy is apparently ambiguous, a decision to require coverage follows after consideration of "legislative goals, social policy, and examination of the transaction as a whole." *Id*. at 258, 782 P.2d at 734. Moreover, "[t]he 'ambiguity' rule applies only after the court is unable to determine how the language of the policy applies to the specific facts of the case." *Preferred Risk Mut. Ins. Co. v. Lewallen*, 146 Ariz. 83, 85, 703 P.2d 1232, 1234 (App. 1985). Accordingly, the core question is whether the policy language is, in fact, ambiguous under the facts of this case.

**A**

¶10     The EMC policy treats "all loss" caused by or involving an employee, resulting from a "series of acts," as a single occurrence. John Brown's embezzlement, although including a number of thefts, was a "series of acts," each one

5

following the other. The policy plainly considers the loss resulting from the embezzlement of a single employee an occurrence, with an attendant $50,000 policy limit. The majority of courts in interpreting similar policy language in corresponding factual situations have so concluded. *E.g.*, *Glaser v. Hartford Cas. Ins. Co.*, 364 F. Supp. 2d 529, 535-37 (D. Md. 2005) (holding, under identical definition, that a single occurrence arose when an employee committed a series of dishonest acts, despite the employee's use of different means to defraud at different times); *Wausau Bus. Ins. Co. v. U.S. Motels Mgmt., Inc.*, 341 F. Supp. 2d 1180, 1183-84 (D. Colo. 2004) (rejecting company's attempt to distinguish single employee's various embezzlements because occurrence is determined by cause and the cause of all loss was the employee's dishonesty); *Bethany Christian Church v. Preferred Risk Mut. Ins. Co.*, 942 F. Supp. 330, 333-35 (S.D. Tex. 1996) (holding policy language identical to that in EMC's policy made all defalcations a single occurrence); *Diamond Transp. Sys., Inc. v. Travelers Indem. Co.*, 817 F. Supp. 710, 712 (N.D. Ill. 1993) (holding loss over several years a single occurrence under same language); *Reliance Ins. Co. v. Treasure Coast Travel Agency, Inc.*, 660 So. 2d 1136, 1137 (Fla. Dist. Ct. App. 1995) (holding, based on definition identical to that of the EMC policy, that "although this employee's embezzlements occurred over a four year period, they

6

constitute a single occurrence"); *Jefferson Parish Clerk of the Court v. Fid. & Deposit Co.*, 673 So. 2d 1238, 1245 (La. Ct. App. 1996) ("This language is inclusive of any scheme to cause loss to the insured, and therefore we agree with the trial court that only one occurrence of employee dishonesty can be found under this definition."); *see also Bus. Interiors v. Aetna Cas. & Sur. Co.*, 751 F.2d 361, 362-63 & n.1 (10th Cir. 1984) ("[T]he cause of Business Interiors' loss was the continued dishonesty of one employee . . . . [T]he employee's fraudulent acts constituted a single loss."). Metrol argues that these cases are distinguishable, yet in each case, under policy language identical or similar to EMC's, a court rejected the contention that dishonest acts of a single employee against the company can be parsed as Metrol contends.

### B

¶11 Metrol nonetheless maintains that the policy is ambiguous. For example, it argues that the phrase "all loss" in the definition of occurrence is unclear because it uses the word "loss" in the singular. To clearly encompass the entire loss attributable to Brown, Metrol claims that the policy needed to refer to losses. But using the singular "loss" does not mean that the phrase "all loss" somehow can be read as "each loss."

¶12 Metrol makes a second, equally unpersuasive, argument to suggest the word loss is ambiguous. It argues that any time

7

the term "loss" is used in employee fidelity or commercial crime policies the term refers to each individual theft in a series of thefts. *See Lincoln Technical Inst. v. Fed. Ins. Co.*, 927 F. Supp. 376, 378-79 (D. Ariz. 1994) (stating there was a "loss sustained" "each time" an employee stole money). Metrol argues that to treat "all loss" attributable to one employee as one occurrence is inconsistent with the district court's opinion in *Lincoln Technical.*

¶13     For three reasons, this argument does not help Metrol. First, in their effort to secure coverage for loss that occurred before an increase in the applicable policy limits took effect, the plaintiffs in *Lincoln Technical* argued that the term "loss sustained" in a commercial crime policy was ambiguous. *Id.* at 378.   Thus, the critical issue was when the loss was "sustained." *Id.* at 378-79.   The issue here is the construction of the defined term "occurrence."

¶14     Second, even assuming that *a* "loss" occurred each time Brown embezzled from Metrol, the policy here expressly groups "*all* loss" attributable to an employee's act or series of acts into a single "occurrence."

¶15     Third, Metrol's alternate reading of the definition of "occurrence" is unpersuasive.   Metrol argues that the policy definition of "[o]ccurrence" – "all loss caused by, or involving, one or more 'employees,' whether the result of a

8

single act or series of acts," – should be interpreted only as preventing an insured business from claiming that the number of occurrences is determined by the number of employees involved in a single theft or the number of acts leading up to a single theft. But because the policy only covers "loss," not acts, the number of employees or acts involved is irrelevant in determining the amount of the "loss." *See Wilson*, 162 Ariz. at 258, 782 P.2d at 734.

C

¶16     Metrol next asserts that we should reject the plain meaning of the phrase "all loss" in the definition of occurrence because it would treat all dishonest acts of employees resulting in multiple instances of loss as a single occurrence. Metrol argues that because all covered losses necessarily result from either an act or a series of acts by employees, a literal reading of the policy would limit coverage to a total of $50,000 even when the thefts were unrelated. Metrol complains that such an interpretation would "nullif[y]" coverage. But this case does not present us with a situation involving unrelated thefts by multiple employees. Because the plain language of the policy covers the situation in this case, we need not consider whether the policy is ambiguous as applied to other circumstances. *See Preferred Risk Mut. Co.*, 146 Ariz. at 85, 703 P.2d at 1234. Nor can we conclude that a policy that provides up to $50,000 in

9

coverage for an employee's series of thefts is illusory.

¶17    Citing *A.B.S. Clothing Collection, Inc. v. Home Insurance Co.*, 41 Cal. Rptr. 2d 166, 174 (Cal. Ct. App. 1995) (finding the same policy language as EMC's ambiguous), and *Karen Kane, Inc. v. Reliance Insurance Co.*, 202 F.3d 1180, 1185 (9th Cir. 2000) (relying on *A.B.S. Clothing*), Metrol counters that the policy itself suggests that multiple occurrences may be covered in a plan year.  The policy states, "[t]he most we will pay for loss in *any one* 'occurrence' is the applicable Limit of Insurance shown in the Declarations," suggesting the possibility of more than one occurrence.  (Emphasis added.)  Yet the policy language defines "occurrence" to include "all loss" attributable to any employee or employees.  Because these two provisions conflict, Metrol argues, a policyholder cannot determine when "any one" occurrence ends and another begins.  Although there may be more than one "occurrence" per year under the policy, it does not follow that losses resulting from a single employee's embezzlement scheme are themselves separate occurrences.  *See Wausau*, 341 F. Supp. 2d at 1183-84 ("The cause of [the insured's] loss was the dishonesty of one employee.  Although the employee appears to have been particularly creative in finding ways to bilk [the insured], her intent throughout undoubtedly was the same: to steal [the insured's] money;" therefore the employee's "embezzlement scheme" constituted one

10

occurrence.) (citations omitted); *see also Glaser*, 364 F. Supp. 2d at 529.[2]

**D**

¶18     Metrol also contends that the phrase "series of acts" in the definition of occurrence is ambiguous.  It argues that the phrase could apply to a series of thefts or a series of acts leading up to a theft.  *See Karen Kane,* 202 F.3d at 1187 (suggesting same).  The policy, however, defines occurrence in terms of "all loss" that results from "a single act" or "series of acts."  Accordingly, only acts from which loss results – the acts of theft – are considered part of the occurrence.  Further, even if preparatory acts are part of a "series of acts," the language is nevertheless broad enough to encompass not only a series of preparatory acts leading up to a theft, but also each series of preparatory acts leading up to each theft.  There is no ambiguity.

**E**

¶19     Metrol asserts that because certain courts have found this policy language ambiguous it must be subject to more than

---

[2]     The court of appeals indicated that "[t]he term 'series' implies some sort of relationship between the acts, and not merely the fact that the same person committed them." *Employers Mut.*, 1 CA-CV 05-0702, slip op. at ¶ 31.  Because the acts in this case were caused by Brown's dishonesty, we need not decide whether the same policy would treat a series of unrelated acts by the same employee as a single occurrence.

11

one reasonable interpretation. Varying judicial interpretations, however, do not automatically render an insurance policy ambiguous. *Wilson*, 162 Ariz. at 257-58, 782 P.2d at 733-34. Further, the cases Metrol relies upon - *A.B.S. Clothing*, *Karen Kane*, and *Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*, 854 A.2d 378, 397 (N.J. 2004) - are not persuasive in light of the plain language in EMC's policy.

¶20 *A.B.S. Clothing*, for example, addressed similar policy language in a distinct scenario. There, the issue was whether an insured business was entitled to a policy-limit recovery each year for an employee's embezzlements when the insured business maintained a policy with the insurance company for a number of years. 41 Cal. Rptr. 2d at 167-68. This issue is distinct from whether an insured business is entitled to multiple recoveries in a single plan year for the acts of one employee discovered that year.

¶21 *Karen Kane*, which cited and relied upon *A.B.S. Clothing*, is similarly distinguishable. *Karen Kane*, 202 F.3d at 1185-88. *Karen Kane* said nothing about whether the policy contemplated multiple recoveries for multiple acts discovered in a single plan year. *See id*. at 1187. To the contrary, the court stated that "[i]f 'occurrence' is construed as limited by policy period, then [the employee's] approximately 150 individual acts of theft, spanning over three years, constitute

12

three separate 'series of acts,' *one for each of the three policy periods* and recoverable within each period as such." *Id*. (emphasis added). Moreover, to the extent the Ninth Circuit panel relied on *A.B.S. Clothing*, it did so because, as a federal court sitting in diversity, it was bound to follow what it perceived to be California law. *Id*. at 1183.

¶22 In addition, Metrol argued before this Court that it is entitled to recover for close to 300 "acts," but it has not argued that it is entitled to recover for two "series of acts" in two plan years.

¶23 Finally, the New Jersey Supreme Court held that, under at least some circumstances, language like that employed by EMC may be subject to a different construction. In *Gentilini Ford*, the court found multiple occurrences, allowing for multiple recoveries, when an employee used fraudulent credit applications to sell individual cars to individual car buyers. 854 A.2d at 397. The court explained that with each sale the employee "caused a separate, direct loss of property to [the dealer] by inducing it to part with an automobile in exchange for a faulty installment sales contract." *Id*. "In these circumstances," the court continued, "in which each purchaser and the terms of each sale are unique, the similarity of the acts do not transform them into one continuous event subject to a single recovery under the policy." *Id*. at 398. The court expressly noted,

13

however, that the case before it did not involve an embezzlement scheme. *Id.* Moreover, to reach its conclusion, the court specifically declined to "adhere to the text's literal limitation because to do so here would nearly vitiate the coverage that both parties clearly contemplated." *Id.* at 397. Metrol has never suggested that it reasonably expected coverage broader than the literal language of the policy.[3]

**III**

¶24 When "the provisions of the contract are plain and unambiguous upon their face, they must be applied as written, and the court will not pervert or do violence to the language used, or expand it beyond its plain and ordinary meaning or add something to the contract which the parties have not put there." *D.M.A.F.B. Fed. Credit Union v. Employers Mut. Liab. Ins. Co.*, 96 Ariz. 399, 403, 396 P.2d 20, 23 (1964); *see also Pawelczyk v. Allied Life Ins. Co.*, 120 Ariz. 48, 52, 583 P.2d 1368, 1372 (App. 1978) ("Courts must give effect to agreements as they are written, however, and ambiguities will not be found or created where they do not exist in order to avoid a harsh result.").

¶25 In any event, Metrol has not suggested any public

---

[3] Metrol never argued to this Court that cases addressing the reasonable expectations of consumers subject to standard form contracts apply here. *See, e.g., Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 389-90, 682 P.2d 388, 394-95 (1984) (recognizing the doctrine of reasonable expectations in contract law).

14

policy that supports its construction of the contract. Under Metrol's interpretation, a dishonest employee would dictate the terms of the employer's recovery by the amount he chose to steal each time during the policy period. In fact, Metrol's interpretation actually hurts insureds who suffer small – often less detectable – losses during the policy period because a number of small thefts – each less than the policy deductible – would be treated separately, preventing an insured from recovering at all in such cases. *See Am. Commerce Ins. Brokers v. Minn. Mut. Fire and Cas. Co.*, 551 N.W.2d 224, 229-30 (Minn. 1996) (concluding that an insured's similar interpretation of a comparable policy was "problematic as a matter of public policy"); *cf. EOTT Energy Corp. v. Storebrand Int'l Ins. Co.*, 52 Cal. Rptr. 2d 894, 900-01 (Cal. Ct. App. 1996) (holding that "[a]s used in the policy, the term 'occurrence' reasonably contemplates that multiple claims could, in at least some circumstances, be treated as a single occurrence or loss. It appears reasonable to us that the term 'occurrence' . . . is effectively referring to *a loss*" and thus not subject to a separate deductible, which, because each theft was less than the deductible would in effect result in no recovery).[4] Accordingly,

---

[4] The parties and the appeals court spent time analyzing *Arizona Property and Casualty Insurance Guaranty Fund v. Helme*, 153 Ariz. 129, 735 P.2d 451 (1987). But *Helme* involved a policy defining an occurrence as "any incident, act or omission, *or*

15

Metrol's interpretation of the policy would visit harsh results on other subscribers to similar policies.

**IV**

¶26      For the foregoing reasons, we vacate the court of the appeals' decision, reverse the judgment of the superior court and remand for proceedings consistent with this opinion.


_____
Michael D. Ryan, Justice

CONCURRING:


_____
Ruth V. McGregor, Chief Justice


_____
Rebecca White Berch, Vice Chief Justice


_____
Andrew D. Hurwitz, Justice


_____
W. Scott Bales, Justice


_____

*series of related incidents, acts or omissions resulting in injury*," *id*. at 134, 735 P.2d at 456, and simply concluded that two separate instances of malpractice by physicians that led to a patient's death were separate occurrences because they were unrelated.  This case involves different policy language and a very different issue.