**NOT FOR PUBLICATION**<sup>*</sup>


## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| TRI-STAR THEME BUILDERS, INC. and PCL CONSTRUCTION SERVICES, INC., | No. 09-17167 |
|  | D.C. No. 2:07-CV-1049-JAT |
| Plaintiffs-Appellants, |  |
| v. | MEMORANDUM |
| ONEBEACON INSURANCE CO., |  |
| Defendant-Appellee. |  |

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, District Judge, Presiding

Argued and Submitted November 5, 2010
San Francisco, California

Before: GOULD and IKUTA, Circuit Judges, and KORMAN,<sup>**</sup> District Judge.

This is an appeal from a judgment entered in the United States District Court

for the District of Arizona in favor of OneBeacon Insurance Company

---

<sup>*</sup> This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

<sup>**</sup> The Honorable Edward R. Korman, Senior United States District Judge for the Eastern District of New York, sitting by designation.

("OneBeacon"). The underlying complaint, which was filed by Tri-Star Theme Builders, Inc./PCL Construction Services, Inc. ("Tri-Star"), alleged that OneBeacon failed to defend and indemnify Tri-Star in an action against it by the Colorado River Indian Tribes ("Tribes"). Tri-Star, the general contractor on a resort and casino project ("Project") being developed by the Tribes, had subcontracted the plumbing and HVAC work to Golden West Mechanical ("Golden West"). Pursuant to the subcontract agreement, Golden West agreed to make Tri-Star an additional insured under its commercial general liability ("CGL") insurance policy. The first policy was entered into on March 24, 1998, three days before Golden West's subcontract agreement was formally executed.

Subsequently, Golden West proceeded to obtain a rider to its CGL policy, effective April 20, 1998, which provided that the "Who Is An Insured" section of the policy (Section II) is amended to include "[Tri-Star], but only with respect to liability arising out of . . . [Golden West's] ongoing operations performed for . . . [Tri-Star] on the [Project] . . . , and only to the extent of liability resulting from occurrences arising out of . . . [Golden West's] negligence." Appellee's Excerpts of R. at 266-67. When the term of the initial policy ended, a second policy, with the same additional insured endorsement and with a coverage period of March 24, 1999 to March 24, 2000, was entered into. Consistent with the above chronology, Tri-Star argues without

2

contradiction that Golden West was engaged in ongoing operations when it obtained the additional insured endorsement.

After the completion of the Project, the Tribes filed a complaint against Tri-Star. In relevant part, the complaint alleged that, after Tri-Star had issued a certificate of substantial completion, the Tribes discovered "substantial and material defects in the design and construction of the resort" and, as a consequence, the Tribes suffered damage. Appellant's Excerpts of R. at 28-32. Some of these damages obviously arose out of the plumbing and HVAC systems for which Tri-Star, as the general contractor, was responsible. After OneBeacon denied Tri-Star's tender of coverage, the latter initiated the present action.

OneBeacon, which is the successor to Hawkeye Insurance Company, the insurer that issued the CGL policy to Golden West, moved for summary judgement. The basis for the motion was that the damage suffered by the Tribes was not covered by the additional insured endorsement to the CGL policy. Under OneBeacon's reading of the policy, Tri-Star was only covered for damages suffered while Golden West was performing work on the Project. Because the complaint against Tri-Star, for which it asked OneBeacon to provide a defense, alleged that the damages suffered by the Tribes arose after the completion of Golden West's operations, OneBeacon argues that it was not obligated to provide either a defense or indemnification. This was so even

3

though the conduct that gave rise to the damage allegedly occurred as a result of Golden West's operations during the construction of the Project. OneBeacon also argued that the complaint and a follow-up letter providing additional information were not adequate to trigger its duty to defend or indemnify. The district court agreed with both of OneBeacon's arguments and granted its motion for summary judgement. This appeal followed.

I.

We turn first to the issue of the construction of the additional insured endorsement. We begin with a brief summary of the common law rules that the Supreme Court of Arizona has promulgated with respect to the construction of insurance contracts. When construing disputed provisions, the language of the policy is critical, *State Farm Mut. Auto. Ins. Co. v. Wilson*, 782 P.2d 727, 734 (Ariz. 1989) (en banc), and the words are given "their plain and ordinary meaning," *Sparks v. Republic Nat'l Life Ins. Co.*, 647 P.2d 1127, 1132 (Ariz. 1982) (en banc). Perhaps most significantly, the construction of the terms of an insurance contract should be undertaken from the perspective of a layman, one "untrained in the law or insurance." *Id*. at 1135. Consequently, Arizona courts are "not concerned with what the 'commercial customs' are in the insurance industry, but rather, what the ordinary person's understanding of the policy would be." *Id*. Moreover, "[w]here the language

4

employed is unclear and can be reasonably construed in more than one sense, an ambiguity is said to exist . . . ." *Id.* at 1132.

Before addressing the consequences of a finding of ambiguity, we address the threshold issue of whether the language of the additional insured endorsement at issue here can reasonably be construed in more than one sense. We hold that it can. Because the additional insured is a general contractor presumably performing work on its own behalf and through a number of other subcontractors, the language can be read to limit the coverage to "liability arising out of [Golden West's] ongoing operations performed for [Tri-Star]," Appellee's Excerpts of R. at 297, as opposed to liability arising out of the negligence of Tri-Star and its other subcontractors.[1] Further, the language can reasonably be construed as limiting Tri-Star's coverage only to the extent expressly specified in the contract (rather than based on a temporal limitation). For example, although the insurance contract, pursuant to exclusion j(6), excludes coverage for "property damage" to "that particular part of any property that

---

[1] The subclause of the additional insured endorsement that provides coverage "only to the extent of liability resulting from occurrences arising out of . . . [Golden West's] negligence," Appellee's Excerpts of R. at 297, was apparently added in response to some cases that had broadly construed the "arising out of" language to provide coverage to the additional insured beyond that for which it would have been vicariously liable. *See, e.g.*, *Mikula v. Miller Brewing Co.*, 701 N.W.2d 613, 622–23 (Wis. 2005) ("If the . . . [insurer] intended to exclude coverage for liability arising from the additional insured's own negligence, it should and could have spelled out as much.").

5

must be restored, repaired or replaced" because the insured's work was "incorrectly performed on it," *Id*. at 312, this exclusion is not applicable to property damage arising out of completed operations. However, because the additional insured endorsement is limited to damages arising out of the insured's "ongoing operations," Tri-Star would not be able to claim this additional "completed operations" coverage. Indeed, as one commentator has observed:

> The key phrase—"arising out of the Named Insured's ongoing operations" (which is not defined)—addresses only the type of activity (ongoing operations) from which the . . . [additional insured's] liability must arise in order to be covered, not when the injury or damage must occur. In other words, this language does not state that injury must occur, or liability must arise, *during* the Name Insured's ongoing operations, but rather requires only that the liability arise "*out of*" the ongoing operations, which may require only a minimal causal connection between the liability and the "ongoing operations." . . . At the very least, there is an argument that the endorsement's undefined language is ambiguous and should be construed against the drafter.

3 Daven Lowhurst et al., *New Appleman Insurance Law Practice Guide* 30A-66 (Jeffrey E. Thomas et al. eds., 2011). Significantly, the only case that construed the additional insured endorsement without resort to the understanding of the insurance industry held that "the only reasonable conclusion" is that the alleged liability for property damage occurring after completion came within the scope of the ongoing operations clause. *Valley Ins. Co. v. Wellington Cheswick, LLC*, No. 05-1886, 2006

6

WL 3030282, at *5 (W.D. Wash. 2006) ("[W]hile the property damage may not have occurred during . . . ongoing operations, the alleged liability did."), *vacated on other grounds*, No. 05-1886, 2007 WL 1531674, at *3 (W.D. Wash. 2007); *see also N.Y. City Hous. Auth. v. Merchants Mut. Ins. Co.*, 44 A.D.3d 540, 541 (N.Y. App. Div. 2007) (where tenant was shot in apartment with a defective doorlock after construction was complete and there was "no record evidence that the doors were faulty due to poor workmanship or installation," as opposed to vandalism, the tenant's injuries did "not arise out of [the insured's] ongoing operations performed for [the Housing Authority]." (second alteration in original)).

Moreover, the cases that have limited coverage of the additional insured endorsement to damages occurring during the named insured's ongoing operations have not relied on the plain language of clause. Instead, they have drawn inferences regarding the scope of coverage by relying on the drafting history of the clause by the insurance industry. The district court's opinion here is illustrative. The district judge conceded that the language of the clause at issue here would cover the property damage alleged in the complaint filed against Tri-Star. As the district judge observed:

> Any claim for personal injury or property damage related
> to a subcontractor's work will, necessarily, relate back to
> the period of time when the subcontractor was working on
> the project. This is so because any action in the causation
> chain that a subcontractor sets in motion will inevitably
> relate back to the subcontractor's negligent actions or faulty

7

> workmanship, which can only occur while the subcontractor is still working on the project.

*Tri-Star Theme Builders, Inc./PCL Constr. Servs., Inc. v. Hawkeye-Sec. Ins. Co.*, 653 F. Supp. 2d 973, 979 (D. Ariz. 2009).

Nevertheless, the district judge declined to apply the language of the clause because doing so would "erase[] the distinction between ongoing operations coverage and completed operations coverage." *Id.* "Thus, the only meaningful distinction between the two types of coverage becomes one of when the damages manifest themselves: during the subcontractor's ongoing operations or after the subcontractor's work is completed? If the latter, then an [additional insured] endorsement containing ongoing operations language will not provide coverage." *Id*.

The district judge's statement is incorrect because, as explained above, another "meaningful distinction between the two types of coverage" is the difference expressly stated in the contract; for example, exclusion j(6) is not applicable to property damage that arises out of completed work. Indeed, OneBeacon concedes that the district judge himself may have gotten it wrong when he suggested that the "only meaningful distinction" between the two types of coverage provided by the CGL policy "becomes one of when the damages manifest themselves." *Id*. On the contrary, the issue OneBeacon argues is when the damages occurred and not when they manifested themselves. Finally, although the contract contains a definition of the "products-

8

completed operations hazard,"[2] nothing in the plain language of that definition indicates that the relationship between "ongoing operations" coverage and "completed operations" coverage is that "ongoing operations" coverage ceases to have effect once the primary insured's operations are complete.

The ongoing operations clause, which appears in the "Who Is An Insured" section, however, addresses "only the type of activity . . . from which the . . . liability must arise in order to be covered, not when the injury or damage must occur." 3 Daven Lowhurst et al., *New Appleman Insurance Law Practice Guide* 30A-66 (Jeffrey E. Thomas et al. eds., 2011). Under these circumstances, construing the words "ongoing operations" to exclude damage that arose from conduct performed by Golden West *while its operations were ongoing* requires a parsing so abstruse as to

---

[2] Under the CGL policy, OneBeacon agrees to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage to which . . . [the] insurance applies." Appellee's Excerpts of R. at 309. Significantly, the "insurance [only] applies to 'bodily injury' and 'property damage' . . . if: . . . [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory' and . . . occurs during the policy period." *Id*. The clause is then qualified by another exception that provides that the "insurance does not apply to: . . . [that] particular part of any property that must be restored, repaired or replaced because '[the insured's] . . . work' was incorrectly performed on it." *Id*. at 312. This exclusion is then qualified by yet another exception that coverage "does not apply to 'property damage' included in the 'products-completed operations hazard.'" *Id*. The "products-completed operations hazard," which appears under "Definitions," provides that "all 'bodily injury' and 'property damage' occurring away from premises . . . [that the insured] own[s] or rent[s] and aris[es] out of '[the insured's] . . . product' or '[the insured's] . . . work'" is covered, *except* for "[w]ork that has not yet been completed or abandoned." *Id*. at 320.

9

be inconsistent with "what the ordinary person's understanding of the policy would be." *Sparks*, 647 P.2d at 1135. This is particularly true here, even if the operative language was unambiguous on its face, because it was obtained by Golden West while it was actually engaged in ongoing operations for Tri-Star. Nor is it of any consequence, as OneBeacon argues, that the certificate of liability insurance "that [allegedly] evidenced Golden West's and OneBeacon's intent when they negotiated [the] contract," Appellee's Br. at 44, was provided to Tri-Star. The certificate contained only the language modifying the "Who Is an Insured" clause; it made no reference to any other clause in the contract.[3]

The intent of the insurance industry draftsmen, which was traced in other cases and upon which the district court relied, *see Tri-Star Theme Builders, Inc.*, 653 F. Supp. 2d at 979–81, is not controlling. While the Supreme Court of Arizona has looked to the case law of other jurisdictions in construing particular clauses in an insurance contract, *see Emp'rs. Mut. Cas. Co. v. DGG & Car, Inc.*, 183 P.3d 513, 516 (Ariz. 2008) (en banc), the three intermediate appellate court cases that the district judge looked to here rely almost exclusively on the intent of the insurance industry

---

[3] "Subcontractors are often required contractually to name . . . the general contractor as [an] additional insured[] under their CGL policies. Compliance is confirmed by issuing policy endorsements to the additional insured parties. They often do not receive the actual endorsement, but rather are notified by way of a certificate of insurance." *Pardee Constr. Co. v. Ins. Co. of the West*, 92 Cal. Rptr. 2d 443, 447 n.2 (Cal. Ct. App. 4th 2000) (citation omitted).

10

draftsmen in order to limit the scope of the clause at issue here. *See Pardee*, 92 Cal. Rptr. 2d at 456, *Hartford Ins. Co. v. Ohio Cas. Ins. Co.*, 189 P.3d 195, 201–02 (Wash. App. 2008), *Weitz Co. v. Mid-Century Ins. Co.*, 181 P.3d 309, 312–13 (Colo. App. 2007). Such evidence "might be persuasive if the controversy . . . were between two insurers," *Sparks*, 647 P.2d at 1135, or if it suggested that the language reflected the *mutual intent* of the parties. *See, e.g.*, *Fireguard Sprinkler Sys. v. Scottsdale Ins.*, 864 F.2d 648, 651 (9th Cir. 1988). This evidence is wholly lacking here. Indeed, as previously observed, the only court to construe the additional insured endorsement, without reference to the industry's drafting history, held that it provided coverage for damages occurring after the completion of operations.

Significantly, the CGL policy here contains clauses that limit the temporal coverage in language that demonstrates the ease with which the intent of the insurance industry's draftsmen could have been reflected. The first is the scope of coverage clause, which provides that "[t]he 'bodily injury' or 'property damage'" for which coverage is provided must occur "during the policy period." Appellee's Excerpts of R. at 309. The plain language of this provision limits the scope of coverage to damage that takes place "during the policy period." *Outdoor World v. Cont'l Cas. Co.*, 594 P.2d 546, 549 (Ariz. Ct. App. 1979); *see also Aetna Cas. & Sur. Co. v. Merritt*, 974 F.2d 1196, 1199 (9th Cir. 1992) ("The definition of 'bodily injury' and 'property

11

damage' limit liability to such injury or damage sustained during the policy period. The clause [is] not a promise by [the insurer] to insure the property for an indefinite time after . . . construction [is] complete."). Consistent with this definition, the clause at issue here could have simply mirrored the foregoing language by providing coverage for property damage arising from *and* occurring during Golden West's ongoing operations.

Clearer limiting language may also be found in the pre-printed automatic additional insured endorsement of the CGL policy. This endorsement reads in relevant part as follows:

> Who Is An Insured is amended to include as an insured any person or organization for whom you are performing operations when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability arising out of your ongoing operations performed for that insured. *A person's or organization's status as an insured under [the automatic status endorsement] ends when your operations for that insured are completed*.

Appellee's Excerpts of R. at 322 (emphasis added). The first two sentences of the foregoing clause are substantially the same as the additional insured endorsement at issue here. The last sentence, however, was omitted from the additional insured endorsement. This sentence would have made it clear that, once Golden West's work

12

was complete, Tri-Star was no longer covered as an additional insured for damages that occurred after Golden West's operations for Tri-Star were finished. *See Tri-Star Theme Builders, Inc.*, 653 F. Supp. 2d at 979. Indeed, although the critical sentence was deleted from the additional insured endorsement, the district judge relied upon its presence in the pre-printed automatic additional insured endorsement as lending additional support to his interpretation of the phrase "ongoing operations" in the additional insured endorsement at issue here. *See id*. We are inclined to draw the opposite conclusion from this deletion. *Cf. Fireguard Sprinklers Sys.*, 864 F.2d at 651 ("Words deleted from a contract may be the strongest evidence of the intention of the parties." (quoting *Royal Indemn. Co. v. John F. Cawrse Lumber Co.*, 245 F. Supp. 707, 711 (D. Or. 1965))).

We acknowledge that, even if the additional insured endorsement is ambiguous, it may not necessarily result in a construction against the insured. While it was once the rule in Arizona that an ambiguous contract was invariably construed against the insurer, the Supreme Court of Arizona has more recently held that, "even if a policy is apparently ambiguous, a decision to require coverage follows [only] after consideration of 'legislative goals, social policy, and examination of the transaction as a whole.'" *Emp'rs Mut. Cas. Co.*, 183 P.3d at 515 (citing *State Farm Mut. Auto. Ins. Co.*, 782 P.2d at 734). The first two considerations, "legislative goals" and

13

"social policy," are not implicated here. Moreover, as we understand the "transaction as a whole," it was intended to provide the same coverage for the additional insured general contractor, Tri-Star, as the name insured subcontractor, Golden West, enjoyed under the CGL policy. Some of the very cases on which OneBeacon relies clearly underscore this consideration. They emphasize that

> contractors who have insisted upon being named as additional insureds will reasonably expect to be covered for the same completed operations as their subcontractors. "Mindful such litigation is typically complex and expensive, it is reasonable to conclude the key motivation in procuring an additional insured endorsement is to offset the cost of defending lawsuits where a general contractor's liability is claimed to be derivative."

*Hartford Ins. Co.*, 189 P.3d at 202 (quoting *Pardee*, 92 Cal. Rptr. 2d at 457).

Notwithstanding the obvious purpose of the general contractor in requiring its subcontractor to make it an additional insured, the insurance industry has endeavored to limit the coverage of the additional insured, even though naming the general contractor as an additional insured would not appear to increase the economic exposure of the insurance company. The coverage is for "bodily injury" or "property damage." Under the terms of the CGL policy, this protection is provided to the named insured, even if the general contractor was not added as an additional insured. Adding an additional insured does not alter the fact that the insurer defends against and, if necessary, provides indemnification for, only one damage claim, albeit against two

14

defendants.

Moreover, this coverage is not open-ended, as one of the cases relied upon by OneBeacon suggested, *see Hartford*, 189 P.3d at 202, because it only applies to "property damage" that "occurs during the policy period." Appellee's Excerpts of R. at 309. In this case, the work was completed no later than June 15, 1999, and the policy would have terminated by its terms on March 24, 2000, although it was canceled by Golden West on August 1, 1999. The policy here (and other similar CGL policies) would not "allow a contractor who is an additional insured to be indemnified for damages arising from a subcontractor's work even if it is not discovered for years." *Hartford*, 189 P.3d at 202.

In sum, an examination of the transaction as a whole does not provide a basis for construing the clause at issue in favor of OneBeacon. On the contrary, our holding will likely result in an easily accomplished change in the wording of the additional insured endorsement in language that is clear to the insured. Such a result furthers the policy of Arizona that, "[i]f an insurer desires to limit its liability under a policy, it should employ language which clearly and distinctly communicates to the insured the nature of the limitation." *Sparks*, 647 P.2d at 1133.

II.

We quickly dispose of OneBeacon's duty to defend argument by observing that,

15

at the very least, the follow-up letter and its accompanying enclosures, taken together with the complaint, provided sufficient information to trigger the obligation to defend. Indeed, the CGL policy itself listed Golden West as a "plumbing contractor," Appellee's Excerpts of R. at 303, and the complaint alleged damages arising out of the plumbing and HVAC work performed during the construction of the resort. Moreover, it is conceded that Golden West performed plumbing and HVAC work there. Although the complaint filed by the Tribes did not mention Golden West, the letter that OneBeacon attached to the complaint explicitly stated that "[u]pon information and belief, some of the alleged damage sought by the Tribe[s] arises out of work performed for . . . [Tri-Star] by Golden West." Appellant's Excerpts of R. at 39. While OneBeacon argued that, "without a copy of the subcontract agreement" between the Joint Venture and Golden West, it was not possible to determine what plumbing work was actually performed by Golden West, Appellee's Excerpts of R. at 20, pre-trial discovery is the appropriate vehicle for addressing their concerns. Indeed, OneBeacon acknowledged that the documents subsequently provided by Tri-Star included the subcontract agreement along with other documents describing the scope of the work of Golden West.

We conclude that the complaint and the cover letter accompanying it were sufficient to trigger the duty to defend. *See Kepner v. W. Fire Ins. Co.*, 509 P.2d 222,

16

224 (Ariz. 1973) ("If the complaint in the action brought against the insured upon its face alleges facts which come within the coverage of the liability policy, the insurer is obligated to assume the defense of the action . . . ." (internal quotation omitted)).

Under these circumstances, it is unnecessary to remand to resolve the disputed issue of fact as to whether OneBeacon received the subsequently provided documents. Although we leave for proceedings on remand the issue of whether other provisions in the CGL policy, such as j(5) and j(6), provided a basis for OneBeacon to refuse to defend, we note our agreement with the district court's holding regarding the insufficiency of the paragraph in the complaint that alleged that "before the resort was opened and thereafter, . . . [the Tribes] provided . . . Tri-Star with punch lists of defects and other items requiring repair and correction . . . ." Appellant's Excerpts of R. at 28 ¶ 30. This allegation failed to allege any property damage arising out of Golden West's work on the Project. Indeed, in the construction industry, a "punch list" merely refers to "work items that need to be done . . . for [a] project to be considered . . . complete." 3 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* § 8:37 (2010); *see also Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 610 A.2d 364, 375 (N.J. 1992) ("Generally, . . . [a] punch list includes those items that restrict the final completion of . . . [a] project."), *abrogated on different grounds by Tretina Printing, Inc. v. Fitzpatrick & Assocs.*, 640 A.2d 788,

17

792–93 (N.J. 1994).

**REVERSED and REMANDED.**