NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

_____

KS STATEBANK, INC., *Plaintiff,*

*v.*

DENNIS SABAN, *Defendant.*

_____

HUNTER FINANCIAL, INC., *Plaintiff/Appellee/Cross-Appellant,*

*v.*

KS STATEBANK, INC., *Defendant/Appellant/Cross-Appellee.*

_____

No. 1 CA-CV 22-0523
FILED 01-16-2024

_____

Appeal from the Superior Court in Maricopa County
Nos.  CV2018-014804
CV2020-011753
CV2020-015272
The Honorable M. Scott McCoy, Judge

**VACATED AND REMANDED**

_____

COUNSEL

Gammage & Burnham, PLC, Phoenix
By Cameron C. Artigue, Jacqueline Marzocca
*Counsel for Defendant/Appellant/Cross-Appellee KS StateBank, Inc.*

Broening Oberg Woods & Wilson, PC, Phoenix
By Brian Holohan, Kelley M. Jancaitis
*Counsel for Plaintiff/Appellee/Cross-Appellant Hunter Financial, Inc.*

---

**MEMORANDUM DECISION**

Chief Judge David B. Gass delivered the decision of the court, in which Presiding Judge Michael J. Brown and Judge Andrew M. Jacobs joined.

---

**G A S S**, Chief Judge:

**¶1**        This appeal requires us to resolve the priority of two lenders' competing security interests arising from a series of commercial loans the lenders made to Dennis Saban DBA Saban Rent-A-Car (Saban). One lender, KS StateBank, Inc., appeals because the superior court limited the amount of the Bank's first-priority lien based on maximum-lien terms in the Bank's two deeds of trust. The other lender, Hunter Financial Inc., cross-appeals the superior court's determining two 2017 loans were secured by the Bank's first-priority lien based on future advances clauses in the Bank's two deeds of trust.

**¶2**        Hunter does not dispute the superiority of the Bank's lien interests arising out of the Bank's deeds of trust up to their "maximum lien" amounts securing the Bank's 2014 and 2016 loans. Hunter argues it was error to conclude Hunter subordinated its second-priority lien to the Bank's 2017 optional loans when Hunter executed a subordination agreement in 2016. The issue, thus, is whether the Bank's optional future advances after Hunter signed the subordination agreement are subject to the lien priority rule established in *La Cholla Group, Inc. v. Timm*, 173 Ariz. 490, 491–92 (App. 1992). They are, meaning any lien of the Bank securing its 2017 optional loans is inferior to Hunter's lien.

**¶3**        For that reason, we vacate the judgment and remand for the superior court to enter judgment for the Bank for any balance owing on its 2016 loan on its first-priority lien, then in favor of Hunter for any balance owing on its loans as the second-priority lien, then in favor of the Bank, as the third-priority lienholder, for any residual amounts up to the balance owing on its 2017 loans.

**FACTUAL AND PROCEDURAL HISTORY**

**I. The Bank's March 2014 loan and 2014 deed of trust[1]**

¶4   In March 2014, the Bank loaned Saban $912,000.00. Saban and the Bank signed a promissory note (which is not in the record) in the Bank's favor and the Bank's 2014 deed of trust securing the note with a lien on six of Saban's properties.

¶5   The first line of the Bank's 2014 deed of trust reads, "MAXIMUM LIEN. The lien of this Deed of Trust shall not exceed at any one time $912,000.00." The Bank's 2014 deed of trust also contains "cross-collateralization" and "future advances" clauses purporting to secure all Saban's current and future debts to the Bank.

**II. Hunter's loan and deed of trust**

¶6   Saban began borrowing money from Hunter in 2009. The parties amended their original 2009 loan agreement whenever Hunter loaned Saban more money. Until 2014, Saban used personal property to secure his debts to Hunter. Starting in 2014, Saban used the same properties he used to secure the Bank's loan to secure the Hunter loan. Between October 2014 and October 1, 2015, Hunter advanced Saban a series of new sums memorialized as amendments to the 2009 loan agreement. In all, Hunter loaned Saban $605,000.00 using the properties as security.

¶7   Hunter's deed of trust does not include "maximum lien" language. Instead, it refers to a $300,000.00 figure as "the indebtedness evidenced by promissory note or notes of 2/19/09 as amended, and an extension or renewal thereof of even date herewith" to identify the loan then being secured. Hunter's deed of trust also contains a future advances clause, which secures "[p]ayment of additional sums and interest thereon which may hereafter be loaned to [Saban], or his successors or assigns, when evidenced by a promissory note or notes reciting that they are secured by this Deed of Trust." In all, Hunter loaned Saban $605,000.00 before it executed a subordination agreement. Hunter asks us to declare its

---

[1]   The Bank and Hunter executed and recorded multiple deeds of trust and subsequent subordination agreements referencing each of the six properties. Because the same six properties were involved in and identically affected by every transaction, we refer in the singular to "the Bank's 2014 deed of trust," "the Bank's 2016 deed of trust," "Hunter's deed of trust," and "the subordination agreement" for ease of reference.

lien priority for that amount is superior to any Bank lien beyond the amount securing the balance of the Bank's 2016 loan.

## III.   The subordination agreement and the Bank's 2016 and 2017 loans

¶8          In 2016, Saban sought a new loan from the Bank. The Bank sought to secure this new loan using a deed of trust on the same six properties. Before the Bank finalized the 2016 loan, Hunter executed a subordination agreement in which Hunter agreed to subordinate its security interest in the six properties to the security interest arising out of the Bank's 2016 loan to Saban. The subordination agreement identified the new interest to which Hunter would subordinate its own as one reflected in a "deed of trust and note in the sum of $256,000.00, dated 4-8-16, in favor of [the Bank]."

¶9          Several days later, the Bank and Saban executed the 2016 loan. But the note memorializing the loan showed a principal amount of $1,168,000.00, not $256,000.00. Similarly, the Bank's 2016 deed of trust on the six properties purported to secure a loan amount of $1,168,000.00, though the same deed of trust showed it secured a maximum lien of $256,000.00. The superior court noted the maximum lien amounts in the Bank's 2014 and 2016 deeds of trust totaled the 2016 note's $1,168,000.00. Hunter characterizes this discrepancy as reflecting a "consolidation" or "novation" of the Bank's 2014 loan ($912,000.00) together with the new principal advanced in the 2016 loan ($256,000.00).

¶10          The Bank's 2016 deed of trust recites the following in its first line: "MAXIMUM LIEN. The lien of this Deed of Trust shall not exceed at any one time $256,000.00." Generally, the Bank's 2016 deed of trust is identical to the Bank's 2014 deed of trust other than several minor differences irrelevant to this appeal and cross-appeal. We note one difference we need not resolve because the parties did not address it. The Bank's 2014 deed of trust has one future advances clause, but the Bank's 2016 deed of trust contains two. The first future advances clause in the Bank's 2016 deed of trust purports to render any future advance from the Bank to Saban obligatory. The second future advances clause, which is identical to that of the Bank's 2014 deed of trust, states nothing in the deed of trust shall constitute a commitment by the Bank to make any future advances. No party has asked us to interpret or resolve the differing future advances clauses. And the Bank has not argued it was obligated to make any future advances, so we do no more than observe this difference.

¶11 In 2017, the Bank gave Saban a third loan for $1,650,000.00 and a fourth for $300,000.00, each memorialized in a new promissory note. Those 2017 notes do not reference the Bank's 2014 or 2016 deeds of trust.

## IV. Saban's default and the ensuing litigation

¶12 By 2018, Saban defaulted on all the loans from the Bank and Hunter. Hunter sued to foreclose on the properties. The Bank filed a complaint for breach of contract against Saban and moved to appoint a receiver, and the superior court approved the sale of two of the six properties for $1.5 million in total. In 2020, Hunter filed a separate complaint for declaratory relief as to the existence, nature, scope, and priority of Hunter's and the Bank's lien rights to the properties and the sale proceeds. The superior court consolidated the three cases for further proceedings.

¶13 The Bank and Hunter cross-moved for partial summary judgment on the amounts and priority of the Bank's and Hunter's respective security interests in the properties. The superior court denied the Bank's motion and granted Hunter's motion "in part only, to the extent that [Hunter]'s lien has priority after the first $1.168 million in proceeds are disbursed to [the Bank]."

¶14 The Bank appeals, and Hunter cross-appeals. This court has jurisdiction over the timely appeal and cross-appeal under article VI, section 9 of the Arizona Constitution, and A.R.S. §§ 12-2101.A.1 and -120.21.A.1.

## DISCUSSION

¶15 This court reviews a grant of summary judgment *de novo*, viewing the facts and reasonable inferences in the light most favorable to the party opposing the motion and affirms for any reason supported by the record. *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 236 Ariz. 326, 329 ¶ 14 (App. 2014).

¶16 The Bank argues the superior court erred when it limited the Bank's first-priority lien to $1,168,000.00. The Bank argues Hunter subordinated the priority of its security lien to any lien securing all future advances (whether obligatory or optional) the Bank made after the subordination agreement. Hunter cross-appeals and offers four arguments for why the Bank's first-priority lien is less than $1,168,000.00.

¶17 The parties agree the subordination agreement and other instruments govern the relative priority of their security liens. Neither party challenges the propriety of the superior court interpreting the subordination agreement on summary judgment to determine the parties' intent. But they both appeal the superior court's interpretation. Their dispute, thus, arises out of alleged legal errors of contract interpretation and application of the law of future advances. Neither the Bank nor Hunter argues the superior court—or this court for that matter—must consider parol evidence to understand their intent, so we do not consider any. *See Taylor v. State Farm Mut. Auto. Ins.*, 175 Ariz. 148, 153 (1993) (reaffirming Arizona courts' commitment to the Corbin rule of contract interpretation, permitting courts to consider parol evidence to construct contracts in accordance with the parties' intent).

¶18 Because courts interpret contracts as a matter of law, this court reviews contract interpretations *de novo,* including whether a contract's terms are "reasonably susceptible to more than one interpretation." *Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 593 ¶ 9 (App. 2009). When interpreting contract terms, this court seeks to identify and enforce the parties' intent. *Id.* Even so, this court may not resort to other rules of construction when the parties express their intent in clear and unambiguous language. *Id.* As the Arizona Supreme Court has said, when the contractual terms "are plain and unambiguous upon their face, they must be applied as written, and the court will not pervert or do violence to the language used." *Emps. Mut. Cas. Co. v. DGG & CAR, Inc.*, 218 Ariz. 262, 267 ¶ 24 (2008). As a result, even when a contract's terms are unclear and ambiguous, this court must avoid interpreting the contract in a way leading to an absurd result. *Roe v. Austin*, 246 Ariz. 21, 26–27 ¶ 17 (App. 2018).

¶19 These same rules apply when interpreting terms in a deed, including a deed of trust and a related subordination agreement. *See* A.R.S. § 33-801(4) (a deed of trust is a contract). Indeed, "[w]hen a deed is unambiguous, the intent of the parties must be discerned from the four corners of the document." *Scalia v. Green*, 229 Ariz. 100, 104 ¶ 19 (App. 2011).

## I. The *La Cholla* Common-Law Rule Determines the Relative Priority of the Bank's and Hunter's Security Liens.

¶20 In *La Cholla*, this court adopted the common-law rule to determine the priority of different parties' security liens in the same property. 173 Ariz. at 491–92. Under *La Cholla*'s common-law rule, recorded liens securing *obligatory* advances under a lender's recorded obligation have priority over intervening liens. *Id.* at 492. But any recorded lien securing the

original mortgagee's later *optional* advances made with notice of an intervening lien loses priority to the intervening creditor's interest. *Id.*

**¶21**      The Bank obtained a first-priority lien in the amount of its 2014 loan as secured by its 2014 deed. The 2014 deed also contained a valid future advances clause, securing "all future advances made by [the Bank] to [Saban] whether or not the advances are made pursuant to a commitment" and in "unlimited amount." But the same clause explicitly precluded any commitment to obligatory future advances secured by the deed: "Nothing in this Deed of Trust shall constitute a commitment to make additional or future advances or loans in any amount. Any such commitment must be agreed to in a separate writing signed by [Saban] and [the Bank]." Hunter later obtained a second-priority lien in the same properties for $605,000.00.

**¶22**      At that point, Hunter's lien on the properties was inferior to the Bank's pre-existing, recorded security interest under the Bank's 2014 deed. According to the *La Cholla* rule, the Bank could not rely on its 2014 deed to establish priority for any optional future advances from the Bank. And, by the deed's own terms, any future advance from the Bank would be optional absent a separate written agreement otherwise with Saban. Thus, any lien securing a future advance from the Bank would be inferior to Hunter's intervening lien. The Bank recognized this. So, before advancing its 2016 loan, the Bank induced Hunter to sign the subordination agreement, which "was aimed at avoiding [the rule of] *La Cholla*."

### A.      The Effect of the Subordination Agreement

**¶23**      According to the Bank's argument, when Hunter executed the subordination agreement, Hunter subordinated its security interest in the properties to the Bank's interest securing the Bank's 2016 note and, contrary to the *La Cholla* common-law rule, all the Bank's optional future advances. The Bank argues the Bank intended this result. But the Bank is a beneficiary of, not a party to, the subordination agreement. And nothing in the subordination agreement's plain language suggests Hunter intended to subordinate its interest to the Bank's interest beyond that securing the Bank's 2016 note. As Hunter mentioned in oral argument, the subordination agreement could have included language to accomplish that intent but did not. For example, Hunter could have included the following language in the subordination agreement: "notwithstanding the common-law rule in *La Cholla*" or "notwithstanding any other law to the contrary." But the subordination agreement includes no such disclaimer.

¶24         Further, even if, as the Bank argues, Hunter—through the subordination agreement—"expressly assented" to "all" terms in the Bank's 2016 deed, nothing in the plain language of the Bank's 2016 deed of trust shows the Bank intended to exempt its optional future advances from the rule of *La Cholla*.

¶25         Under *La Cholla*, liens securing obligatory future advances take priority over intervening liens only when the obligation to make those future advances has been recorded. *La Cholla*, 173 Ariz. at 492. Optional future advances are inferior to intervening liens. *Id.* Here, the Bank recorded no obligation to advance funds to Saban in the future. To the contrary, the Bank's 2014 and 2016 deeds of trust explicitly said any future advances from the Bank would be optional absent a separate written agreement between Saban and the Bank. The Bank has not shown evidence of any such agreement or its recordation as *La Cholla* would require for enforcement against Hunter or any other third party. *See id.* On the other hand, the Bank had sufficient notice of Hunter's intervening loan to render the Bank's interest in the properties securing any optional future advance inferior to Hunter's. *Cf. id.* (holding constructive notice alone is insufficient).

¶26         A mortgagee may subordinate its security interest in a property to another existing or future interest in the same property by a declaration. Restatement (Third) of Property: Mortgages ("Restatement") § 7.7. That declaration must describe "with reasonable specificity" the interest to which the mortgagee is subordinating its own interest. *Id.* "[R]easonable specificity depends on the circumstances" but "at a minimum" requires "an identification of the new lender or the type of lender, an upper limit on the initial amount of that debt, and an upper limit on its interest rate." Restatement § 7.7 cmt. b.

¶27         The subordination agreement identifies Hunter as the lender, the upper limit on the initial amount of debt, and the lender's subordination of its own security interest by referencing "a deed of trust and note in the sum of $256,000.00, dated 4-8-16, in favor of KSB StateBank." The subordination agreement also declares "[t]hat said deed of trust . . . shall unconditionally be and remain at all times a lien or charge on the property therein described, prior and superior to the lien or charge of [Hunter's deed]." The Bank's 2016 deed was notarized on April 8, 2016, and it set a maximum lien value of $256,000.00.

¶28         The Bank's 2016 deed specifically says it secures the note the Bank and Saban executed on April 8, 2016. But that note shows a principal

amount of $1,168,000.00, not $256,000.00. As discussed above, Hunter characterizes this transaction as a "consolidation" or "novation" of the Bank's 2014 loan ($912,000.00) together with the new principal advanced in its 2016 loan ($256,000.00). Hunter's characterization tracks with the superior court's noting in its ruling the maximum lien provisions in the Bank's 2014 and 2016 deeds of trust were for the same amounts and totaled $1,168,000.00. We accept Hunter's unchallenged characterization as consistent with the principle of reading substantially contemporaneous instruments together to determine the nature of the transactions between the parties. *See Pearll v. Williams*, 146 Ariz. 203, 206 (App. 1985). The "deed of trust and note in the sum of $256,000.00, dated 4-8-16," specified in the subordination agreement reasonably identifies the Bank's 2016 deed dated April 8, 2016, with its $256,000.00 "maximum lien" and its associated note. That note's terms, in turn, specify the upper limit on the interest rate of the new debt.

¶29            Under these circumstances, the subordination agreement meets the requirement of reasonable specificity restated in the Restatement as to the 2016 loan. When Hunter executed the subordination agreement and the Bank executed its 2016 note and deed, the Bank maintained its original first-priority security interest in the amount of any remaining balance on its first loan for $912,000.00. At that point, the Bank also added a new first-priority security interest in an amount of any new advance under its 2016 note up to $268,000.00, as established in the subordination agreement and the Bank's 2016 note.

¶30            Based on the plain language in both the Bank's 2016 deed and the subordination agreement, any new amount beyond $268,000.00 was outside Hunter's subordination of its interest and subject to prioritization under the *La Cholla* rule. Nothing in the 2016 deed says the *La Cholla* rule will not apply to Hunter's lien priority. The same is true of the subordination agreement. Even if we accept the superior court's finding the 2017 loans relate to and constitute future advances under the 2014 and 2016 deeds, the 2017 loans were not obligatory, and the Bank was aware of Hunter's intervening lien when it made them. Hunter's lien, thus, has priority over any lien of the Bank's securing its 2017 loans. To conclude otherwise would "pervert or do violence to the language used." *See Emps. Mut. Cas. Co.*, 218 Ariz. at 267 ¶ 24. And to follow the Bank's reasoning would lead to an absurd result: an interpretation of the 2016 deed for Hunter that differs from the interpretation of the same plain language for any other intervening lender. *See Roe*, 246 Ariz. at 26–27 ¶ 17.

¶**31** In short, the Bank argues "the subordination agreement . . . aimed at avoiding *La Cholla*," but the plain language of neither the subordination agreement nor the Bank's 2016 deed of trust suggests, let alone realizes, this alleged aim. The Bank's argument the maximum lien clause of its deed of trust has any effect on *La Cholla* security priority similarly fails.

### B. The Maximum Lien Terms Do Not Alter the *La Cholla* Priority Analysis.

¶**32** The Bank argues the maximum-lien clauses are statements of "maximum obligation" that preserve the priority of future advances no matter whether those advances are optional or obligatory. Not so. Nothing in the plain language of the maximum-lien clauses suggests any effect on the relative priority of the security interests under the deed. The Bank simultaneously argues that, in any case, the future advances clauses render the maximum-lien clauses legally meaningless. But, as discussed above, the future advances clauses themselves have no bearing on the priority of the interests they secure, except for as far as they render any future advances based on the deed optional—because optional advances lose their lien priority to intervening liens.

¶**33** The Bank's first-priority interest does not exceed the maximum lien amounts in the Bank's deeds. We, thus, need not resolve how the maximum-lien clauses otherwise might affect the validity of the Bank's security interests.

### ATTORNEY FEES AND COSTS

¶**34** Both the Bank and Hunter request attorney fees under A.R.S. § 12-341.01. In our discretion, we decline to award attorney fees because of the preliminary nature of this case on remand. On remand, the superior court may consider any request for attorney fees, including attorney fees incurred in this appeal, when this litigation concludes. *See Eans-Snoderly v. Snoderly*, 249 Ariz. 552, 559 ¶ 27 (App. 2020). We award Hunter its taxable costs on appeal as the prevailing party on compliance with ARCAP 21.

## CONCLUSION

**¶35** We vacate the superior court's judgment and remand for the superior court to determine the balances Saban owes on his debts to the Bank and to Hunter and to enter judgment consistent with this decision.



AMY M. WOOD • Clerk of the Court
FILED: TM